Christopher Kao (SBN 237716)
ckao@velaw.com
Vinson & Elkins L.L.P.
555 Mission Street, Suite 2000
San Francisco, CA 94105
Tel: 415.979.6900 / Fax: 415.651.8786

Christine Yang (SBN 102048)
cyang@sjclawpc.com
Law Office of S.J. Christine Yang
17220 Newhope Street, Suite 101-102
Fountain Valley, CA 92708
Tel.: 714.641.4022 / Fax: 714.641.2082

*Attorneys for Defendant*
*Kingston Technology Company, Inc.*

Submitted under seal pursuant to 11/22/16 Court Order [Dkt. 94]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

POLARIS INNOVATIONS LIMITED,

Plaintiff,

vs.

KINGSTON TECHNOLOGY COMPANY, INC.,

Defendant.

---

KINGSTON TECHNOLOGY COMPANY, INC.,

Counterclaimant,

vs.

POLARIS INNOVATIONS LIMITED,

Counter-Defendants,

and

SAMSUNG ELECTRONICS CO., LTD., and SAMSUNG SEMICONDUCTOR, INC.,

Third-Party Defendants.

Case No. 8:16-cv-00300-CJC-RAO

**KINGSTON TECHNOLOGY COMPANY, INC.'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant Kingston Technology Company, Inc. ("Kingston"), by and through undersigned counsel, hereby submits its Second Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff Polaris Innovations Limited's ("Polaris") Complaint dated February 19, 2016 ("Complaint") as follows:

## ANSWER TO COMPLAINT

## JURISDICTION

1. Kingston admits the Complaint purports to state a cause of action for patent infringement arising under Title 35 of the United States Code. Kingston denies it has infringed the patents-in-suit. Kingston admits that subject matter jurisdiction over this action exists under 28 U.S.C. §§ 1331 & 1338(a). Except as expressly admitted, any remaining allegations of Paragraph 1 are denied.

2. Paragraph 2 states legal conclusions to which no response is required. Kingston does not contest that personal jurisdiction exists over Kingston for purposes of this action only. Kingston denies it has committed acts of patent infringement, including making, selling, offering to sell, directly or through intermediaries, subsidiaries and/or agents, infringing products within this district, including to customers in this district. Except as expressly admitted, any remaining allegations of Paragraph 2 are denied.

## VENUE

3. Paragraph 3 states legal conclusions to which no response is required. Kingston admits it is headquartered in Fountain Valley, California. Any remaining allegations of Paragraph 3 are denied.

## THE PARTIES

4. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 and therefore denies them.

5. Kingston admits it is a corporation organized and existing under the laws of Delaware with its principal place of business at 17600 Newhope Street, Fountain Valley, California 92708. Any remaining allegations of Paragraph 5 are denied.

`

## NATURE OF THE ACTION

6. Paragraph 6 states legal conclusions to which no response is required. Kingston denies it has committed unauthorized, willful, or infringing manufacture, use, sale, offering for sale, and/or importation of products and methods incorporating Polaris's patented inventions. Any remaining allegations of Paragraph 6 are denied.

7. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7 and therefore denies them.

8. Paragraph 8 states legal conclusions to which no response is required. Kingston denies that it makes, sells, offers for sale, or imports products and methods that infringe the Asserted Patents. Any remaining allegations of Paragraph 8 are denied.

## THE ASSERTED PATENTS

9. Kingston admits that what purports to be a copy of the United States Patent No. 6,157,589 ("the '589 Patent") is attached to the Complaint as Exhibit 1 and that the face of the '589 Patent bears the title "Dynamic semiconductor memory device and method for initializing a dynamic semiconductor memory device." Any remaining allegations of Paragraph 9 are denied.

10. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10 and therefore denies them.

11. Kingston admits that what purports to be a copy of the United States Patent No. 6,438,057 B1 ("the '057 Patent") is attached to the Complaint as Exhibit 2 and that the face of the '057 Patent bears the title "DRAM refresh timing adjustment device, system and method." Any remaining allegations of Paragraph 11 are denied.

12. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12 and therefore denies them.

13. Kingston admits that what purports to be a copy of the United States Patent No. 6,850,414 B2 ("the '414 Patent") is attached to the Complaint as Exhibit 3 and that the face of the '414 Patent bears the title "Electronic printed circuit board

having a plurality of identically designed housing-encapsulated semiconductor memories." Any remaining allegations of Paragraph 13 are denied.

14. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14 and therefore denies them.

15. Kingston admits that what purports to be a copy of the United States Patent No. 7,206,978 B2 ("the '978 Patent") is attached to the Complaint as Exhibit 4 and that the face of the '978 Patent bears the title "Error detection in a circuit module." Any remaining allegations of Paragraph 15 are denied.

16. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16 and therefore denies them.

17. Kingston admits that what purports to be a copy of the United States Patent No. 7,315,454 B2 ("the '454 Patent") is attached to the Complaint as Exhibit 5 and that the face of the '454 Patent bears the title "Semiconductor memory module." Any remaining allegations of Paragraph 17 are denied.

18. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18 and therefore denies them.

19. Kingston admits that what purports to be a copy of the United States Patent No. 7,334,150 B2 ("the '150 Patent") is attached to the Complaint as Exhibit 6 and that the face of the '150 Patent bears the title "Memory module with a clock signal regeneration circuit and a register circuit for temporarily storing the incoming command and address signals." Any remaining allegations of Paragraph 19 are denied.

20. Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20 and therefore denies them.

`

**COUNT I:**

**KINGSTON'S PURPORTED INFRINGEMENT OF U.S. PATENT NO. 6,157,589**

21. Kingston incorporates by reference its responses to the allegations in Paragraphs 1-20 above as if fully set forth herein.

22. Paragraph 22 states legal conclusions to which no response is required. Kingston denies that it infringes, literally or under the doctrine of equivalents, the '589 Patent, and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 22 are denied.

23. Kingston admits that what purports to be an image of the front and back views of Kingston's SM2280S3/120G product is shown in Paragraph 23. Any remaining allegations of Paragraph 23 are denied.

24. Kingston admits that what purports to be a front image of Kingston's SM2280S3/120G product is shown in Paragraph 24. Any remaining allegations of Paragraph 24 are denied.

25. Kingston denies the allegations of Paragraph 25 of the Complaint.

26. Paragraph 26 states legal conclusions to which no response is required. Kingston denies that it has induced or continues to induce infringement of the '589 Patent pursuant to 35 U.S.C. § 271(b). Any remaining allegations of Paragraph 26 are denied.

27. Paragraph 27 states legal conclusions to which no response is required. Kingston denies that it has induced or continues to induce infringement of the '589 Patent pursuant to 35 U.S.C. § 271(b). Kingston admits that it received a letter from Polaris regarding the potential licensing of the '589 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes or has induced infringement of the '589 Patent and denies that any alleged infringement was willful. All remaining allegations of Paragraph 27 are denied.

`

28. Paragraph 28 states legal conclusions to which no response is required. Kingston denies that it has contributed to or continues to contribute to infringement of the ’589 Patent pursuant to 35 U.S.C. § 271(c). Any remaining allegations of Paragraph 28 are denied.

29. Kingston denies the allegations of Paragraph 29 of the Complaint.

30. Paragraph 30 states legal conclusions to which no response is required. Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’589 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes the ’589 Patent and denies that any alleged infringement was willful. All remaining allegations of Paragraph 30 are denied.

## COUNT II:

## KINGSTON’S PURPORTED INFRINGEMENT OF U.S. PATENT NO. 6,438,057

31. Kingston incorporates by reference its responses to the allegations in Paragraphs 1-30 above as if fully set forth herein.

32. Paragraph 32 states legal conclusions to which no response is required. Kingston denies that it infringes the ’057 Patent, literally or under the doctrine of equivalents, and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 32 are denied.

33. Kingston admits that what purports to be an image of the front and back views of Kingston’s KVR16R11D4/16 product is shown in Paragraph 33. Any remaining allegations of Paragraph 33 are denied.

34. Kingston admits that what purports to be a schematic diagram of Kingston’s KVR16R11D4/16 product is shown in Paragraph 34. Any remaining allegations of Paragraph 34 are denied.

35. Kingston denies the allegations of Paragraph 35 of the Complaint.

`

36. Paragraph 36 states legal conclusions to which no response is required. Kingston denies that it has induced or continues to induce infringement of the ’057 Patent pursuant to 35 U.S.C. § 271(b). Any remaining allegations of Paragraph 36 are denied.

37. Kingston denies the allegations of Paragraph 37 of the Complaint.

38. Kingston denies the allegations of Paragraph 38 of the Complaint.

39. Kingston denies the allegations of Paragraph 39 of the Complaint.

40. Kingston denies the allegations of Paragraph 40 of the Complaint.

41. Kingston denies the allegations of Paragraph 41 of the Complaint.

42. Kingston denies the allegations of Paragraph 42 of the Complaint.

43. Kingston denies the allegations of Paragraph 43 of the Complaint.

44. Kingston denies the allegations of Paragraph 44 of the Complaint.

45. Kingston denies the allegations of Paragraph 45 of the Complaint.

46. Kingston denies the allegations of Paragraph 46 of the Complaint.

47. Kingston denies the allegations of Paragraph 47 of the Complaint.

48. Paragraph 48 states legal conclusions to which no response is required. Kingston denies that it has actively induced its customers or other third parties to directly infringe the ’057 Patent pursuant to 35 U.S.C. § 271(b). Any remaining allegations of Paragraph 48 are denied.

49. Kingston denies that it has actively induced its customers or other third parties to directly infringe the ’057 Patent. Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’057 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes or has induced infringement of the ’057 Patent and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 49 are denied.

50. Paragraph 50 states legal conclusions to which no response is required. Kingston denies that it has contributed to or continues to contribute to infringement of

`

the ’057 Patent pursuant to 35 U.S.C. § 271(c). Any remaining allegations of Paragraph 50 are denied.

51. Kingston denies the allegations of Paragraph 51 of the Complaint.

52. Paragraph 52 states legal conclusions to which no response is required. Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’057 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes the ’057 Patent and denies that any alleged infringement was willful. All remaining allegations of Paragraph 52 are denied.

**COUNT III:**

**KINGSTON’S PURPORTED INFRINGEMENT**

**OF U.S. PATENT NO. 6,850,414**

53. Kingston incorporates by reference its responses to the allegations in Paragraphs 1-52 above as if fully set forth herein.

54. Paragraph 54 states legal conclusions to which no response is required. Kingston denies that it infringes the ’414 Patent, literally or under the doctrine of equivalents, and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 54 are denied.

55. Kingston admits that what purports to be an image of the front and back views of Kingston’s KVR16R11D4/16 product is shown in Paragraph 55. Any remaining allegations of Paragraph 55 are denied.

56. Kingston admits that what purports to be a schematic diagram of Kingston’s KVR16R11D4/16 product is shown in Paragraph 56. Any remaining allegations of Paragraph 56 are denied.

57. Kingston denies the allegations of Paragraph 57 of the Complaint.

58. Kingston denies the allegations of Paragraph 58 of the Complaint.

59. Kingston denies the allegations of Paragraph 59 of the Complaint.

`

60. Paragraph 60 states legal conclusions to which no response is required. Kingston denies that it has actively induced its customers or other third parties to directly infringe the ’414 Patent pursuant to 35 U.S.C. § 271(b). Any remaining allegations of Paragraph 60 are denied.

61. Kingston denies that it has actively induced its customers or other third parties to directly infringe the ’414 Patent pursuant to 35 U.S.C. § 271(b). Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’414 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes or has induced infringement of the ’414 Patent and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 61 are denied.

62. Kingston denies the allegations of Paragraph 62 of the Complaint.

63. Paragraph 63 states legal conclusions to which no response is required. Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’414 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes the ’414 Patent and denies that any alleged infringement was willful. All remaining allegations of Paragraph 63 are denied.

## COUNT IV:
## KINGSTON’S PURPORTED INFRINGEMENT OF U.S. PATENT NO. 7,206,978

64. Kingston incorporates by reference its responses to the allegations in Paragraphs 1-63 above as if fully set forth herein.

65. Paragraph 65 states legal conclusions to which no response is required. Kingston denies that it infringes the ’978 Patent, literally or under the doctrine of equivalents, and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 65 are denied.

`

66. Kingston admits that what purports to be an image of the front and back views of Kingston's KVR21R15D4/16 product is shown in Paragraph 66. Any remaining allegations of Paragraph 66 are denied.

67. Kingston denies the allegations of Paragraph 67 of the Complaint.

68. Kingston denies the allegations of Paragraph 68 of the Complaint.

69. Kingston denies the allegations of Paragraph 69 of the Complaint.

70. Kingston denies the allegations of Paragraph 70 of the Complaint.

71. Kingston denies the allegations of Paragraph 71 of the Complaint.

72. Kingston denies the allegations of Paragraph 72 of the Complaint.

73. Kingston denies the allegations of Paragraph 73 of the Complaint.

74. Paragraph 74 states legal conclusions to which no response is required. Kingston denies that it has actively induced its customers or other third parties to directly infringe the '978 Patent pursuant to 35 U.S.C. § 271(b). Any remaining allegations of Paragraph 74 are denied.

75. Kingston denies that it has actively induced its customers or other third parties to directly infringe the '978 Patent pursuant to 35 U.S.C. § 271(b). Kingston admits that it received a letter from Polaris regarding the potential licensing of the '978 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes or has induced infringement of the '978 Patent and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 75 are denied.

76. Kingston denies the allegations of Paragraph 76 of the Complaint.

77. Paragraph 77 states legal conclusions to which no response is required. Kingston admits that it received a letter from Polaris regarding the potential licensing of the '978 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes the '978 Patent and denies that any alleged infringement was willful. All remaining allegations of Paragraph 77 are denied.

`

**COUNT V:**

**KINGSTON'S PURPORTED INFRINGEMENT**

**OF U.S. PATENT NO. 7,315,454**

78. Kingston incorporates by reference its responses to the allegations in Paragraphs 1-77 above as if fully set forth herein.

79. Paragraph 79 states legal conclusions to which no response is required. Kingston denies that it infringes the '454 Patent, literally or under the doctrine of equivalents, and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 79 are denied.

80. Kingston admits that what purports to be an image of the front and back views of Kingston's KVR16R11D4/16 product is shown in Paragraph 80. Any remaining allegations of Paragraph 80 are denied.

81. Kingston admits that what purports to be a schematic diagram of Kingston's KVR16R11D4/16 product is shown in Paragraph 81. Any remaining allegations of Paragraph 81 are denied.

82. Kingston denies the allegations of Paragraph 82 of the Complaint.

83. Kingston denies the allegations of Paragraph 83 of the Complaint.

84. Kingston denies the allegations of Paragraph 84 of the Complaint.

85. Kingston admits that its KVR16R11D4/16 product complies with certain portions of certain JEDEC standards. Any remaining allegations of Paragraph 85 are denied.

86. Paragraph 86 states legal conclusions to which no response is required. Kingston denies that it has actively induced its customers or other third parties to directly infringe the '454 Patent pursuant to 35 U.S.C. § 271(b). Any remaining allegations of Paragraph 86 are denied.

87. Kingston denies that it has actively induced its customers or other third parties to directly infringe the '454 Patent pursuant to 35 U.S.C. § 271(b). Kingston admits that it received a letter from Polaris regarding the potential licensing of the

’454 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes or has induced infringement of the ’454 Patent and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 87 are denied.

88. Kingston denies the allegations of Paragraph 88 of the Complaint.

89. Paragraph 89 states legal conclusions to which no response is required. Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’454 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes the ’454 Patent and denies that any alleged infringement was willful. All remaining allegations of Paragraph 89 are denied.

## COUNT VI:
## KINGSTON’S PURPORTED INFRINGEMENT OF U.S. PATENT NO. 7,334,150

90. Kingston incorporates by reference its responses to the allegations in Paragraphs 1-89 above as if fully set forth herein.

91. Paragraph 91 states legal conclusions to which no response is required. Kingston denies that it infringes the ’150 Patent, literally or under the doctrine of equivalents, and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 91 are denied.

92. Kingston admits that what purports to be an image of the front and back views of Kingston’s KVR13LR9D4/16 product is shown in Paragraph 92. Any remaining allegations of Paragraph 92 are denied.

93. Kingston denies the allegations of Paragraph 93 of the Complaint.

94. Kingston denies the allegations of Paragraph 94 of the Complaint.

95. Kingston denies the allegations of Paragraph 95 of the Complaint.

96. Kingston denies the allegations of Paragraph 96 of the Complaint.

97. Kingston denies the allegations of Paragraph 97 of the Complaint.

`

98. Kingston denies the allegations of Paragraph 98 of the Complaint.

99. Kingston denies the allegations of Paragraph 99 of the Complaint.

100. Kingston denies the allegations of Paragraph 100 of the Complaint.

101. Kingston denies the allegations of Paragraph 101 of the Complaint.

102. Paragraph 102 states legal conclusions to which no response is required. Kingston denies that it has actively induced its customers or other third parties to directly infringe the ’150 Patent pursuant to 35 U.S.C. § 271(b). Any remaining allegations of Paragraph 102 are denied.

103. Kingston denies that it has actively induced its customers or other third parties to directly infringe the ’150 Patent pursuant to 35 U.S.C. § 271(b). Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’150 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes or has induced infringement of the ’150 Patent and denies that any alleged infringement was willful. Any remaining allegations of Paragraph 103 are denied.

104. Kingston denies the allegations of Paragraph 104 of the Complaint.

105. Paragraph 105 states legal conclusions to which no response is required. Kingston admits that it received a letter from Polaris regarding the potential licensing of the ’150 Patent on February 1, 2016, but Kingston denies that this communication constituted actual notice of infringement of this patent. Kingston denies that it infringes the ’150 Patent and denies that any alleged infringement was willful. All remaining allegations of Paragraph 105 are denied.

## **PLAINTIFF’S REQUEST FOR RELIEF**

Paragraphs 106–112 set forth Polaris’ statement of relief to which no response is required.

Kingston denies that Polaris is entitled to any relief whatsoever as prayed or otherwise.

`

Kingston denies each and every allegation of the Complaint not already admitted or denied and further denies that Polaris is entitled to any relief whatsoever from Kingston on the basis of any of the purported claims for relief contained in the Complaint.

## PLAINTIFF'S JURY DEMAND

Paragraph 113 sets forth Polaris' request for trial by jury to which no response is required.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

Polaris' Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

### (Non-Infringement)

Kingston has not infringed and does not infringe, either literally or under the doctrine of equivalents, nor contributed to infringement by others, nor actively induced others to infringe, any purportedly valid claim of the '589, '057, '414, '978, '454, and/or '150 Patents (the "Asserted Patents").

### THIRD AFFIRMATIVE DEFENSE

### (Invalidity)

On information and belief, the Asserted Patents, and each and every claim thereof, are invalid for failure to comply with one or more requirements of Title 35, United States Code, including without limitation the provisions of 35 U.S.C. §§ 101, 102, 103, 112, and 132, and the rules, regulations, and laws pertaining thereto.

### FOURTH AFFIRMATIVE DEFENSE

### (Non-Infringing Alternatives)

Any claim by Polaris for damages is limited by the existence of non-infringing alternatives to the Asserted Patents.

`

**FIFTH AFFIRMATIVE DEFENSE**

**(No Injunctive Relief)**

Polaris is not entitled to injunctive relief because Kingston has not infringed and is not infringing any valid and enforceable claim of the Asserted Patents and because any purported injury to Polaris is not immediate or irreparable. To the extent Polaris proves that it would be entitled to any relief, it would have an adequate remedy at law. Moreover, the public interest and balance of hardships weigh against an injunction under the circumstances of this case.

**SIXTH AFFIRMATIVE DEFENSE**

**(Prosecution History Estoppel)**

Upon information and belief, by reason of prior art and the proceedings in the U.S. Patent and Trademark Office during the prosecution of the applications that led to the issuance of the Asserted Patents, including, without limitation, amendments, representations, concessions, and admissions made by or on behalf of the applicant, Polaris is estopped from asserting that at least some of the Asserted Patents cover and include any Kingston products alleged to infringe the Asserted Patents under the doctrine of equivalents.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Waiver, Laches, Estoppel, and Acquiescence)**

Polaris' claims are barred, in whole or in part, by the equitable doctrines of waiver, laches, estoppel, and/or acquiescence, and/or other equitable doctrines.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Limitation on Damages)**

Polaris' claims for recovery are barred, in whole or in part, by 35 U.S.C. § 287.

`

**NINTH AFFIRMATIVE DEFENSE**

**(Limitation on Damages)**

Under the provisions of 35 U.S.C. § 286, Polaris is precluded from seeking recovery for any of Kingston's alleged infringing acts occurring more than six years before the filing of the Complaint.

**TENTH AFFIRMATIVE DEFENSE**

**(Action Including an Invalid Claim and Limitation on Recovery of Costs)**

Polaris' prayer for costs is barred, in whole or in part, by Polaris' failure to disclaim any invalid claims under 35 U.S.C. § 288.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(License and/or Exhaustion)**

Polaris' claims are precluded, in whole or in part, to the extent any allegedly infringing products are licensed either expressly or impliedly and/or under the doctrine of patent exhaustion or first sale.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Implied License)**

On information and belief, Polaris' claims for recovery are barred, in whole or in party, by the doctrine of express license and/or implied license.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Absence of Damages)**

Polaris has not suffered and will not suffer any injury or damages by way of the acts and conduct of Kingston as alleged in the Complaint.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

Polaris' claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

`

**FIFTEENTH AFFIRMATIVE DEFENSE**

**(Patent Misuse)**

Plaintiffs' claims are barred, in whole or in part, by the equitable doctrine of patent misuse.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**(Violation of RAND Commitment)**

To the extent any of the asserted patents are alleged by Polaris to be infringed because of compliance with any standards, such as Joint Electron Device Engineering Council ("JEDEC") standards, Polaris does not offer licenses to the Asserted Patents on fair, reasonable, and non-discriminatory terms and therefore Polaris is not entitled to any recovery.

**OTHER AFFIRMATIVE DEFENSES**

Kingston's investigation of the claims and its defenses is continuing. In addition to the affirmative defenses set forth herein, Kingston expressly reserves the right to amend its Answer to allege and assert any additional affirmative defenses and counterclaims or to supplement its existing defenses under Rule 8 of the Federal Rules of Civil Procedure.

**COUNTERCLAIMS**

Defendant and Counter-claimant Kingston Technology Company, Inc. ("Kingston") hereby submits its Counterclaims against Plaintiff and Counterclaim Defendant Polaris Innovations Limited ("Polaris") and Third-Party Defendants Samsung Electronics Co., Ltd., and Samsung Semiconductor, Inc. (collectively, "Samsung"), and upon information and belief as to the actions of all persons and entities other than Kingston, alleges as follows:

**THE NATURE OF THE ACTION**

1. By these Counterclaims, Kingston is seeking damages and injunctive relief to address an improper and unlawful conspiracy, monopolization, and attempt to monopolize through conspiratorial and exclusionary conduct. Samsung has conspired

`

with Polaris and engaged in exclusionary conduct with the purpose and effect of increasing the costs of its competitors—including Kingston, among others—to obtain, entrench or maintain its monopoly.

2. Among other things, Samsung has unlawfully refused to deal with Kingston, and Polaris and Samsung have conspired to unlawfully acquire and enforce certain worthless and exhausted patents in breach of Polaris' and Samsung's commitments to license such patents on fair, reasonable and non-discriminatory terms.

3. As a result of such conspiratorial and exclusionary conduct, Samsung and Polaris have harmed Kingston's business and property, and have threatened to exclude Kingston from the Dynamic Random Access Memory ("DRAM") semiconductor ("DRAM Chip") and DRAM module ("DRAM Module") markets, have reduced competition in these markets, and have caused and threaten to cause imminent harm to purchasers in these markets, as well as to Kingston. Kingston has suffered, and will suffer, antitrust injury as its injuries arise from reduced competition in the DRAM Chip and DRAM Module markets.

## INTRODUCTION

### Dynamic Random Access Memory

4. DRAM is the dominant, most common form of computer memory. "Random access memory" means that data can be accessed directly from any part of the memory, rather than having to proceed sequentially from a starting place. "Dynamic" means that the storage cells are refreshed or given a new electronic charge every few microseconds.

5. A collection of DRAM memory cells is often colloquially referred to as a DRAM Chip. DRAM Chips by themselves are useless. A computer cannot use a single loose DRAM Chip or a collection of loose DRAM Chips as its memory. DRAM Chips connect with and communicate in a computer only when the DRAM Chips are incorporated into a module (what is known as a DRAM Module), or soldered onto the motherboard of the computer. With no independent utility, the

value of, and demand for, DRAM Chips are derived from their storage capabilities once incorporated into products, like computers, that need volatile memory. DRAM Modules are a critical component of computers, providing the computer's memory functions. Today's computers rely on DRAM Modules for a wide variety of memory functions.

## Parties

6. Kingston has a long history of successfully supplying DRAM Modules to the computer industry. Kingston's DRAM Modules business has at least two distinct models. In the first model, Kingston designs and manufactures Kingston-branded DRAM Modules and sells them to customers including computer manufacturers such as Dell and Hewlett-Packard ("OEMs"), distributors and retailers. For the DRAM Modules it manufactures, Kingston typically buys DRAM Chips directly from DRAM Chip manufacturers like Samsung, SK Hynix Inc. ("Hynix") and Micron Technology, Inc. ("Micron"). Alternatively, a portion of Kingston's DRAM Module business operates on a consignment model. Under the consignment model, OEMs (Kingston's customers) arrange for the purchase of DRAM Chips and consign the DRAM Chips to Kingston to be incorporated into a DRAM Module on behalf of the OEM.

7. The second model of Kingston's DRAM Modules business is what is called the "buy and hold" model. In this business, Kingston issues purchase orders on behalf of OEM customers for DRAM Modules designed and manufactured by other companies, like Samsung, Hynix and Micron, and holds them in inventory until the OEMs need them. (Often the DRAM Modules are purchased during times of high supply and low demand, when prices are low.) The OEMs then periodically buy the DRAM Modules from Kingston's "buy and hold" inventory as needed. This buy and hold business is conducted in consultation with and at the request of several of Kingston's largest customers and is available only because Kingston has the financial wherewithal to finance the cost of the inventory.

`

8. Both aspects of Kingston's business support each other. That is, Kingston could not continue its buy and hold business without its business of buying DRAM Chips and independently selling DRAM Modules, and vice versa.

9. The Kingston business imposes a substantial and unique constraint on Samsung's market power in both the DRAM Chip and DRAM Module markets. Kingston's business model enables it to provide low-priced DRAM Modules to OEMs and the computer industry. The lower costs are attributed to Kingston (1) being able to take advantage of buying DRAM Chips in bulk during times of excess supply (and low prices) to incorporate into the DRAM Modules it makes and (2) holding DRAM Module inventory until DRAM Module customers wish to buy them. The model also enables Kingston to achieve economies of scale. Success is based on the flexibility associated with being a nimble producer with low overhead that can strategically purchase components from a number of suppliers when prices are low. As a low-cost producer, Kingston is the pricing maverick and not only competes head-to-head with Samsung and others in the DRAM Module business but fosters competition between Samsung and its only two significant rivals in the DRAM Chip market, Hynix and Micron. Like Samsung, Hynix and Micron are vertically integrated semiconductor manufacturers of both DRAM Chips and DRAM Modules.

10. Third-Party Defendants Samsung Electronics Co., Ltd., and its wholly-owned subsidiary, Samsung Semiconductor, Inc. (collectively, "Samsung"), operate together as a vertically integrated semiconductor company. As the largest manufacturer of DRAM Chips and DRAM Modules in the world, Samsung holds monopoly power in the markets for both DRAM Chips and DRAM Modules. Recent data shows that Samsung has approximately 50% of the global DRAM Chip market and more than 50% of the global market for DRAM Modules for computers. Through the conduct alleged herein, Samsung has created monopolies in the DRAM Chip and DRAM Module markets, conspired to create monopolies and has attempted to maintain and enhance those monopolies using a wide array of exclusionary conduct

`

that, when taken together, insulates Samsung from competition to the detriment of the DRAM Chip and DRAM Module markets, the computer industry and Kingston.

11. Counterclaim-Defendant Polaris is a subsidiary of WiLAN, Inc. ("WiLAN"). In the intellectual property and patent world, WiLAN and Polaris are referred to as "non-practicing entities." They look to extract licenses and royalties, but do not themselves practice the technologies covered by the patents they seek to enforce. In 2015, Polaris conspired with Samsung to acquire a portfolio of approximately 7,000 patents, called the "Qimonda Portfolio." The patents contained in the Qimonda Portfolio cover a wide range of technologies, including DRAM and others. Polaris alleges that patents in the portfolio are relevant to the technology of DRAM Chips, which largely has been commoditized.

<u>DRAM Chips and DRAM Module Markets Are Dominated by Samsung</u>

12. The market for DRAM Chips is a relevant market. The Federal Trade Commission and the Department of Justice, as well as many courts, use a hypothetical monopolist test to identify antitrust markets. Under that test, the market is defined by the smallest set of products in which the only seller of a product (i.e., the hypothetical monopolist) could profitably increase prices by a small but significant and non-transitory amount ("SSNIP"). The test is used because profitable price increases indicate that customers prefer to absorb anticompetitive prices and suffer antitrust injury rather than switch to alternative products. The test is a measure of the degree to which products in the market compete with and are interchangeable with products outside of the market.

13. A hypothetical monopolist could profitably increase DRAM Chip prices by a SSNIP. Customers have no reasonable alternatives to DRAM Chips when making DRAM Modules for computers. Other computer memory such as static random access memory, flash memory and others are not reasonably interchangeable with DRAM Chips. The industry recognizes the differences between DRAM and other computer memory in terms of functionality, speed and cost. The market for

`

DRAM Chips is therefore an antitrust market. The DRAM Chip market is global in scope, as customers can source DRAM Chips from around the world.

14. The market for DRAM Chips has become highly concentrated. Years ago there were many DRAM Chip manufacturers, including Micron; Hynix; Samsung; Qimonda AG; Infineon Technologies AG.; Mosel Vitelic Corporation (USA); Elpida Memory (USA), Inc.; ProMOS; NEC Electronics, Inc. and others. Today the DRAM Chip market is effectively limited to just three companies that together hold 95% of the DRAM Chip market—Samsung, Micron and Hynix.

15. Samsung is by far the dominant firm, holding more than 50% of the DRAM Chip market, and possibly significantly more. The DRAM Chip business is highly concentrated, using the Federal Trade Commission and Department of Justice index for concentration, the Herfindahl-Hirschman Index (the "HHI"). Highly concentrated markets have an HHI above 2,500. The HHI in the DRAM Chip market is above 3,000. DRAM Chip prices have increased as concentration has increased.

16. There are barriers to entry in the DRAM Chip market. DRAM Chips are made at fabrication facilities colloquially known as "fabs." Building a fab costs hundreds of millions of dollars and takes years. DRAM Chip production generally must run consistently, regardless of the extent of the demand for DRAM Chips at any given time. Marked by highly intensive capital investment, the DRAM Chip business can generate large gains in a short cycle, yet is vulnerable to substantial financial loss due to the volatility of market conditions with drastic fluctuation in pricing and demand/supply. In part because of this volatility, a number of previously existing semiconductor manufacturers have either gone bankrupt or left the DRAM Chip business. Such cyclical behavior also discourages entry. Further a new entrant would likely require patent licenses from Samsung, Hynix and Micron, which are not likely to be available to actual or potential new entrants. Conspiratorial and exclusionary conduct by Samsung and Polaris also deters entry. New entrants would have to not

only overcome the cost of entry and the need to obtain licenses from its competitors, but Samsung and Polaris likely would bring patent litigation against new entrants.

17. The market for DRAM Modules is also a relevant market. Customers have no reasonable alternatives to DRAM Modules when making computers. The industry recognizes the need for DRAM technology and DRAM Modules to make a computer. Based on price, cost and functionality, there is no alternative to DRAM Modules for OEMs. Computers are universally designed to use DRAM Modules. Redesigning computers is simply not feasible. Nothing is interchangeable with a DRAM Module for a computer manufacturer or other buyer of DRAM Modules. Applying the hypothetical monopolist test, the market for DRAM Modules is an antitrust market. The market is global, as customers can source DRAM Modules from around the world.

18. The market for DRAM Modules also has become highly concentrated. Over the years, there have been many companies that manufactured and sold DRAM Modules. For example, Centon Electronics Inc.; Kelly Micro Systems Inc.; Cumulus Corp. and Advantage Memory Corp. have either exited the DRAM Module business or nearly been forced out. Furthermore, some of the large, vertically integrated manufacturers of DRAM Chips and DRAM Modules, such as Qimonda and Elpida, have gone bankrupt. Thus, over time, competition has been diminished, leaving Samsung, Hynix, Micron and Kingston as the primary suppliers of DRAM Modules to computer manufacturers. Samsung has thus obtained an increased share of the DRAM Module market as a result of this reduced competition. Samsung's share of the DRAM Module market for computers exceeds 50%. Using the HHI, the market is above 3,300 and, thus, is highly concentrated. Indeed, as with the DRAM Chip market, Samsung now dominates the DRAM Module market and is the largest supplier of DRAM Modules in the world.

19. There are barriers to entry in the DRAM Module market. To enter the DRAM Module market a new entrant would need access to DRAM Chips. One way

`

to enter the market would be to become a vertically integrated DRAM Module manufacturer. But a vertically integrated DRAM Module manufacturer would also have to enter the DRAM Chip market. Barriers to entering the DRAM Chip market (discussed above) mean that the entry into the DRAM Chip market by a vertically integrated DRAM Module manufacturer is not feasible. The alternative is to buy DRAM Chips from Samsung, Hynix and/or Micron, and manufacture DRAM Modules (as Kingston does). But Samsung will not sell DRAM Chips to new entrants making entry into the DRAM Module business difficult, if not impossible. New entrants also need the financial wherewithal to buy DRAM Chips at low prices and hold inventory. Absent this advantage, they could not compete with Samsung, Hynix and Micron.

20. Kingston provides a substantial and unique constraint on Samsung's market power. Kingston has sophisticated planning tools that enable it to optimize its production to make the best use of the components that happen to be available on the market at any given time at discounted prices. Kingston's business model allows it to take advantage of low prices on DRAM Chips. Kingston's presence therefore forces the DRAM Chip suppliers to compete to supply Kingston. This is particularly true when the demand for DRAM is low because fabs must continue running at steady rates. As such, Kingston provides for Samsung's competitors—Hynix and Micron—an efficient outlet for the DRAM Chips. Removing Kingston as a customer for DRAM Chips would disproportionately raise the costs of inventorying DRAM Chips for Samsung's smaller rivals, Hynix and Micron, and reduce the incentive for Hynix and Micron to expand output. Consequently, eliminating Kingston as a customer for DRAM Chips would also give Samsung the ability to raise DRAM Chip prices.

21. Kingston's business model has resulted in Kingston's becoming a significant supplier of DRAM Modules and imposing a substantial competitive constraint on the price of DRAM Modules and DRAM Chips produced by Samsung. This is not only true when at times of increasing demand, but generally though the

year. Removing Kingston from the market would reduce competition in the supply of DRAM Modules. In addition, Samsung's withholding of DRAM Chips from Kingston raises the cost of DRAM Chips to Kingston, diminishing Kingston's incentive to expand its supply of DRAM Modules and forcing Kingston to raise its prices for DRAM Modules. In turn, Kingston will become a less effective competitor in the supply of DRAM Modules, an already highly concentrated industry, resulting in an increase in DRAM Module prices.

22. Samsung also sells large quantities of DRAM Modules to major OEMs like Dell and Hewlett Packard. Eliminating Kingston will remove a significant competitive constraint on Samsung's DRAM Module monopoly and prices. Kingston's DRAM Module business provides a disruptive and pro-competitive force in the DRAM Module market. Samsung has every incentive to remove that competitive constraint. On its own and through its conspiracy with Polaris, Samsung endeavors to remove or weaken Kingston as a competitor, causing harm to competition in the markets for DRAM Chips and DRAM Modules, and to Kingston.

23. In short, the exclusion of Kingston will result in higher prices for DRAM Chip customers and also DRAM Module customers.

The Conspiratorial and Exclusionary Conduct of Samsung and Polaris

24. In approximately 2008, after many years of selling DRAM Chips to Kingston, and as its market share was increasing, Samsung (the largest supplier of DRAM Chips) refused to continue to sell DRAM Chips to Kingston. At no time did Samsung provide any reason for its refusal to sell DRAM Chips to Kingston. Upon information and belief, Samsung continues to sell to existing smaller DRAM Module manufacturers. By refusing to sell DRAM Chips to Kingston, Samsung hoped to eliminate the competition from Kingston in the DRAM Module market, and to raise DRAM Chip and DRAM Module prices.

25. Samsung has no legitimate purpose for refusing to sell DRAM Chips to Kingston. Samsung's unlawful refusal to sell DRAM Chips to Kingston forced

`

Kingston to scramble to find sources for DRAM Chips from a limited number of remaining DRAM Chip manufacturers today, primarily from Hynix or Micron. These companies have significantly less manufacturing capacity than Samsung to produce and supply DRAM Chips, and the effect of Samsung's refusal to deal with Kingston has been to make it more difficult for Kingston to conduct its DRAM Module business.

26. In addition to Samsung's unlawful refusal to deal, Samsung and Polaris have conspired to unlawfully acquire a portfolio of virtually worthless DRAM-related patents (the Qimonda Portfolio) and to assert those patents in a discriminatory and exclusionary manner.

27. Qimonda AG ("Qimonda") was once an affiliate of Infineon AG ("Infineon"), a German semiconductor manufacturing company that had been spun out of the German technology conglomerate Siemens AG. Until its bankruptcy and restructuring in approximately 2008, Qimonda was one of the largest suppliers of DRAM Chips in the world and was the owner of the Qimonda Portfolio, made up of approximately 7,000 patents. In connection with Qimonda's bankruptcy and restructuring proceedings, Infineon paid about €125 million to acquire the Qimonda Portfolio.

28. Last year, Samsung and Polaris conspired to acquire the Qimonda Portfolio in Polaris' name. In particular, Samsung funded one-half of the Qimonda Portfolio purchase price, up to €16 million. In return, Samsung obtained a royalty-free license to the Qimonda Portfolio. However, this license was completely unnecessary because Samsung—like most, if not all, other DRAM Chip manufacturers in the world—already had licenses to the entire Qimonda Portfolio.

29. In addition, under the conspiratorial agreement between Polaris and Samsung, Polaris is obligated to repay Samsung its share of the purchase price by providing 5% of the royalties earned from the Qimonda Portfolio. Samsung, however,

can never earn a return on its investment. Polaris' repayment obligations are capped at the amount that Samsung initially funded; Samsung can only break even.

30. There is accordingly no economic benefit to Samsung under its agreement with Polaris apart from the exclusionary effect that the Polaris patent litigation has on Samsung's competitors, such as Kingston. Samsung obtained a license to patents that it already had a license to, and can never recover more in return from Polaris than the amount originally contributed by Samsung for the purchase of the Qimonda Portfolio. In effect, Samsung has provided an interest-free loan of €16 million to Polaris in order to enable, encourage and conspire with Polaris to pursue patent litigation against Samsung's competitors in the DRAM Chip and DRAM Module businesses. Moreover, the Samsung-Polaris agreement additionally provides Samsung with the express option to influence or control the litigation of certain patents in the Qimonda Portfolio.

31. Samsung and Polaris acquired the Qimonda Portfolio with full knowledge that it was burdened with licenses to most major DRAM Chip manufacturers, and commitments in any event to license the patents on fair, reasonable and non-discriminatory terms ("FRAND commitment").

32. The Qimonda Portfolio was previously owned by Infineon. Infineon is and has been a member of the JEDEC Solid State Technology Association ("JEDEC") (formerly the Joint Electron Device Engineering Council). Samsung also is a member of JEDEC. JEDEC promulgates the industry standards controlling the design and operation of DRAM, among other things. JEDEC requires members to disclose all patents that practice on a JEDEC-adopted standard and to license those patents in a fair, reasonable and non-discriminatory manner. Upon information and belief, both Infineon and Samsung previously disclosed their respective DRAM-related patents to JEDEC and committed to license those patents on fair, reasonable and non-discriminatory terms. Polaris and Samsung inherited Infineon's FRAND commitments to the Qimonda Portfolio when they jointly acquired the portfolio from

`

Infineon. Upon information and belief, Polaris and Samsung knew of the Infineon FRAND commitment when they conspired to buy the Qimonda Portfolio. Polaris and Samsung are bound by those FRAND commitments.

33. By any reasonable financial measure, the Qimonda Portfolio is valueless, and any royalties charged to a DRAM Chip or DRAM Module manufacturer are inherently discriminatory, because Samsung has a royalty free license to the entire Qimonda Portfolio.

34. Kingston, as a maker of DRAM Modules, has never been required to obtain a license to the Qimonda Portfolio, until the recent acquisition of the Qimonda Portfolio by Polaris, working with Samsung. Shortly after acquiring the Qimonda Portfolio, Polaris filed its complaint for patent infringement in the present action naming only Kingston as a defendant. Samsung was identified as having a financial interest in Polaris' litigation against Kingston. The Complaint alleges patent infringement by Kingston relating to Kingston's manufacture and sale of DRAM Modules and seeks to force Kingston to pay Polaris discriminatory royalties to license patents in connection Kingston's DRAM Modules.

35. Through its conspiratorial agreement with Polaris, Samsung is looking for discriminatory royalties to be extracted from its competitor Kingston, which has the effect of raising Kingston's costs and reducing competition.

36. The payment of royalties removes the cost advantage that Kingston has over vertically integrated rivals such as Samsung (and Hynix and Micron). Such payments limit or eliminate the financial wherewithal for Kingston to engage in its business strategy and offer low-price DRAM Modules to the computer industry. The increased cost or elimination of Kingston removes one of the only checks on Samsung's market power and constitutes an injury to competition.

37. Upon information and belief, but for Samsung's conspiratorial agreement with Polaris, Polaris would not have brought suit against Kingston. But for Samsung acquiring an interest in patents that may be asserted against Samsung's competitors in

`

the DRAM Module market (like Kingston), the agreement between Samsung and Polaris regarding the Qimonda Portfolio is economically irrational. That is, Samsung financed the acquisition of a portfolio of patents (1) that it already had a license to, and thus did not need to license again, and (2) that it has no chance of receiving any financial return from, given the cap on the 5% to be paid back from Polaris to Samsung. Samsung knew the portfolio had little value to it, except in the ability to assert 7,000 patents against its rivals. The suit targeting Kingston is almost certainly the first in a long line of suits that Polaris and Samsung will bring together against other Samsung competitors in the markets for DRAM Chips, DRAM Modules and other electronic components. Samsung and Polaris rely on the threat of serial patent infringement litigation over the various technologies involved in Kingston's manufacturing of DRAM Modules to inhibit Kingston's incentive to work around Polaris's patent claims, and coerce disproportionately costly terms for licensing the Qimonda Portfolio, which had never previously been asserted against Kingston and other DRAM Module manufacturers.

38. Taken as a whole, Samsung and Polaris have engaged in unlawful conspiratorial, discriminatory and exclusionary conduct that has and will continue to cause substantial and irreparable harm to Kingston.

39. The conspiratorial and exclusionary conduct by a monopolist, Samsung, and co-conspirator, Polaris, violates Section 1 of the Sherman Act, Section 2 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 2 and 18, as well as Section 16750 of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*. and Section 17200 of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.

## THE PARTIES

### Counterclaim and Third Party Plaintiff

40. Counterclaim and Third Party Plaintiff Kingston is a corporation organized and existing under the laws of Delaware with its principal place of business

`

at 17600 Newhope Street, Fountain Valley, California 92708. Among other things, Kingston makes and markets memory module products and is one of the world's largest memory module companies. Kingston employs more than 4,000 people worldwide.

Counterclaim and Third-Party Defendants

41. Counterclaim-Defendant Polaris participated as co-conspirator with Samsung in the violations of law alleged in this Complaint and has engaged in conduct and made statements in furtherance thereof. On information and belief, Polaris is a corporation organized and existing under the laws of Ireland, with its principal place of business at 29 Earlsfort Terrace, Dublin 2, Republic of Ireland. Polaris is a wholly-owned subsidiary of WiLAN Inc. ("WiLAN"). Polaris and WiLAN are both non-practicing entities. WiLAN has described itself to potential investors as "one of the most successful patent licensing companies in the world."[1]

42. Third-Party Defendant Samsung Electronics Co., Ltd. is a Korean Corporation with its principal offices at 129 Samsung-ro, Yeongtong gu, Suwon-City, Gyeonggi-do, 443-742, Korea. On information and belief, Samsung is the largest company in South Korea. Samsung designs and manufactures a wide range of products, including consumer electronics and computer components, which it provides to customers in the United States and the worldwide market. Samsung manufactures, sells and distributes DRAM Chips and DRAM Modules throughout the United States and worldwide.

43. Samsung acts in the United States partially through its subsidiary, Third-Party Defendant Samsung Semiconductor, Inc. ("Samsung Semiconductor"), which has a principal place of business at 3655 North First Street, San Jose, California. Third-Party Defendant Samsung Electronics Co., Ltd. wholly owns and controls its subsidiary Samsung Semiconductor. Upon information and belief, Samsung

[1] "Investing in WiLAN", http://www.wilan.com/investors/investor-relations/.

Semiconductor sells and distributes DRAM Chips and DRAM Modules, including those manufactured by Samsung Electronics Co., Ltd., to customers throughout the United States. Samsung Semiconductor has transacted business with Kingston relevant to the allegations and issues herein.

44. In 2005, Samsung Electronics Co., Ltd. and Samsung Semiconductor entered into a plea agreement with the United States Department of Justice admitting participation, from at least April 1, 1999 through June 15, 2002, in a criminal conspiracy to fix the price of DRAM sold to certain original equipment manufacturers.

## JURISDICTION AND VENUE

45. This Court has exclusive original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331. This action arises under the Patent Act of 1952, 35 U.S.C. §§ 1, *et seq.*, as amended, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. Exclusive jurisdiction for any action arising under any Act of Congress relating to patents is conferred on U.S. District Courts pursuant to 28 U.S.C. § 1338(a).

46. Kingston's First through Twelfth Claims for Relief are actions for declaratory relief and attorneys' fees under 28 U.S.C. § 2201 and 35 U.S.C. § 101 *et seq*. These counts arise under Title 35 of the U.S. Code and decisional law relating to patent infringement, validity, and enforceability.

47. In addition, this Court has supplemental jurisdiction over Kingston's Thirteenth Claim for Relief (breach of contract) pursuant to 28 U.S.C. § 1367 because the claim is so related to claims in the action within such original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

48. Kingston brings its Fourteenth through Twenty-First Claims for Relief against Samsung and Polaris under Sections 4, 7 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 18 and 26 for treble damages, injunctive relief and attorney's fees and costs for

`

violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, under Section 16750 of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*. and Section 17200 of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, for treble damages, injunctive relief, and attorney's fees. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies) and 28 U.S.C. § 1367 (supplemental jurisdiction).

49. Upon information and belief, this Court has personal jurisdiction over Samsung because Samsung has committed or attempted to commit acts that unreasonably restrain the trade of DRAM Chips and DRAM Modules, and has conspired to commit acts that unreasonably restrain the trade of DRAM Chips and DRAM Modules, with the knowledge or understanding that DRAM Chips and DRAM Modules are sold in the State of California, including substantial numbers in this District. Upon information and belief, by these acts, Samsung has caused and will cause harm to the market for DRAM Chips and DRAM Modules in this District, in which Kingston substantially participates and from which Kingston derives significant revenue.

50. Polaris has submitted to jurisdiction in this Court.

51. Venue is proper in this District pursuant to 15 U.S.C. § 22; 28 U.S.C. §§ 1391(b), (c), and (d); and 28 U.S.C. § 1400(b) because this suit was filed in this District by Polaris, Samsung transacts business within this District and offers DRAM Chips and DRAM Modules for sale in this District that compete with Kingston's business in this District, and on information and belief Polaris conducts business in this District.

`

## INTERSTATE COMMERCE

52. The products at issue in this action are sold in interstate commerce, and the unlawful activities alleged in these Counterclaims have occurred in, and have a substantial effect upon, interstate commerce.

## GENERAL ALLEGATIONS

Standards-Setting Organizations and Standards Essential Patents

53. Polaris acquired more than 7,000 patents (the "Qimonda patent portfolio"), including the Asserted Patents, from Infineon Technologies AG ("Infineon") on or around June 2, 2015. Infineon was the original owner and assignee of the Asserted Patents.

54. Infineon has been a member of the Joint Electron Device Engineering Council ("JEDEC"), a trade association and standards-setting organization ("SSO"). On information and belief, Infineon is a member of at least JEDEC's JC-42 Solid State Memories and JC-45 DRAM Modules Committees.

55. For more than half a century, JEDEC or its predecessors have developed open standards and publications for the microelectronics industry. For example, to ensure that DRAM modules interoperate with the technologies with which they are paired in host devices, industry participants develop common standards for DRAM products through JEDEC.

56. Collaboratively established industry standards possess great value. SSOs efficiently produce open standards available for all industry participants to adopt. By ensuring that related technology products use a common architecture, SSOs facilitate the emergence of products that are more attractive to consumers, who value the convenience of interoperability. Standards also facilitate price- and quality-based competition, hasten product-development time, prevent companies from investing in the wrong direction, and make it unnecessary for consumers to delay buying their desired products for fear that later developments will render their chosen purchase defunct.

`

57. JEDEC recognizes these advantages, observing that "JEDEC's collaborative efforts ensure product interoperability, benefiting the industry and ultimately consumers by decreasing time-to-market and reducing product development costs."

58. When industry participants meet in a SSO to identify a standard for their next-generation products, they must choose among alternative technologies that cover many distinct components of the standard. If it were not the case that there are frequently technical alternatives for each feature or function of a given technical standard, there would be little need for SSOs, a primary purpose of which is to facilitate that selection process among those alternatives.

59. In this "ex ante" setting—*i.e.*, before the SSO adopts a new standard (or new version of a standard)—a patentee could negotiate with the SSO to have its claimed technology included in the proposed standard. To persuade the SSO to adopt its technology over substitutes, a patentee would compete on the basis of price and quality. The royalty that such a patentee could command ex ante reflects the patent's marginal value over alternative technologies, and is limited by the SSO's ability to choose a non-proprietary or non-infringing standard-that is, to "design around" the asserted patent.

60. Once an SSO chooses a standard and industry adopts it, alternative technologies and design-around are no longer available. At that moment, any patents reading on the adopted standard are "standard-essential patents" ("SEPs"), such that their owners possess significant market power due to "hold-up."

61. As the Ninth Circuit has observed, "[t]he catch with standards is that it may be necessary to use patented technology in order to practice them. As a result, standards threaten to endow holders of standard-essential patents with disproportionate market power. In theory, once a standard has gained such widespread acceptance that compliance is effectively required to compete in a particular market, anyone holding a standard-essential patent could extract

unreasonably high royalties from suppliers of standard-compliant products and services. This problem is a form of 'patent holdup.'" *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 876 (9th Cir. 2012) (citations and quotations omitted).

62. JEDEC, like other SSOs, has therefore adopted policies designed to protect competition and prevent its members from holding-up firms that implement its chosen standards. The JEDEC Patent Policy requires members and participants in any JEDEC committee to disclose any patents they own that are potentially essential to the standards being developed by JEDEC, and to agree to license any of its SEPs on reasonable and non-discriminatory ("RAND") or royalty-free terms.

63. On information and belief, for consideration, including membership and participation in JEDEC, Infineon entered into an express and/or implied contract with JEDEC, and agreed to disclose patents potentially essential to the standards being developed by JEDEC and to license its SEPs on either a royalty-free basis or on RAND terms.

64. As a member of JEDEC, Infineon thus had an obligation to disclose any patents that might be essential to the work of at least JEDEC's JC-42 and JC-45 Committees, which developed standards upon which Polaris appears to base at least some of its claims of infringement of the Asserted Patents in this case. Infineon also had an obligation to license any of its SEPs relating to the JEDEC standards on royalty-free or RAND terms.

65. On and information and belief, when Polaris acquired the Qimonda patent portfolio from Infineon, which included the Asserted Patents, Polaris took all of the patents subject to these RAND and related encumbrances from Infineon. Polaris assumed the burden of Infineon's enforceable promise to license any alleged SEPs on RAND terms.

66. Kingston is a third-party beneficiary of these contractual promises, which run with the encumbered patents.

`

## The Relevant Markets

*DRAM Chip Market*

67. DRAM Chips are sold mostly in DRAM Module form to OEMs, which are typically computer companies such as Dell, Hewlett Packard, and others. OEMs determine the number and configuration of DRAM Modules that can be supported when designing their computers. DRAM Chips are also sold in module form to channel distributors and retailers so that end-buyers can easily upgrade their computers by adding DRAM Modules.

68. DRAM Chips are a commodity. Functionally equivalent DRAM Chips are available largely from the three major semiconductor manufacturers, Hynix, Micron and Samsung. One reason for this is that through JEDEC and independent activities of DRAM technology owners, DRAM Chip manufacturers and DRAM Module makers and customers, the industry has settled around industry-standard DRAM chips.

69. DRAM Chips are not interchangeable with other forms of computer memory; when making DRAM Modules for computers, customers have no reasonable alternatives to DRAM Chips. There are no reasonable substitutes for DRAM Chips when making DRAM Modules for computers. Flash memory and static random access memory, for example, are not interchangeable with and cannot reasonably substitute for DRAM due to substantive functionality differences.

70. Under the hypothetical monopolist test, the market for DRAM Chips is a relevant market. A hypothetical monopolist could profitably increase prices of DRAM Chips by a SSNIP.

71. The number of DRAM Chip makers has steadily decreased over the years, resulting in an increasing concentration of the market. U.S. antitrust

enforcement authorities use the HHI to measure market concentration.[2] Markets with an HHI score above 2,500 are considered highly concentrated; the HHI score for the DRAM Chip market exceeds 3,000. Twenty years ago, there were twenty or more DRAM Chips suppliers. By 2009, that number had dropped to seven. Today, 95% of the DRAM Chip market is controlled by just three suppliers—Samsung, Hynix and Micron. Samsung's market share has steadily increased from, upon information and belief, about 35% in 2010 to at least 50%, and possibly significantly more, of the DRAM Chip market now. Correspondingly, the prices of DRAM Chips have increased as the three suppliers—and particularly Samsung—have strengthened and increased their respective market shares.

72. Industry commentators recognize that the DRAM Chip market is highly concentrated and acts anticompetitively. For example, Avril Wu, a research manager at DRAMeXchange, calls the industry an oligopoly (with Samsung, Hynix and Micron as the three suppliers) and explains that the "trio [of DRAM Chip suppliers] have opted for co-existence as the best way to maximize their own profitability. They therefore are turning away from aggressively competing for market share through price reduction and capacity expansion."[3] Wu also reports a recent strategic DRAM price increase, noting "[i]n the short term, rising prices lift up margins for suppliers" and, in the long run, reinforce the barrier to entry for competitors.[4]

73. DRAM Chips are produced in large scale semiconductor fabrication facilities called "fabs". Semiconductor fabrications facilities require multiple billions of dollars in investment and a great deal of know-how to operate efficiently.

---

[2] HHI takes the sum of the square of each firm's market share. Thus, Samsung with a share of 50% would contribute 2500 points to the HHI. A market with three equally sized firms would have an HHI of 3267 (= $33^2 + 33^2 + 33^2$).

[3] Jessie Shen, *DRAM contract prices rise over 20% in October, says DRAMeXchange,* DIGITIMES, Nov. 3, 2016, http://www.digitimes.com/news/a20161102VL202.html.

[4] *Id.*

`

Moreover, fabs operate continuously to maintain efficiency so that it is infeasible for manufacturers to modulate supply with seasonal changes in demand. Accordingly, DRAM Chip manufacturing is characterized by substantial scale economies, and a very large minimum efficient scale, and therefore high barriers to entry.

74. The entrance of new competitors in the DRAM Chip market is not feasible. Barriers to entry in the DRAM Chip market are high and increasing. Significant barriers include very high fixed costs (such as the multi-billion dollar investment required to build a fab), the cost of equipment, the need for economies of scale, limited access to patent cross-licenses and high switching costs.

*DRAM Module Market*

75. A DRAM Module is made by assembling multiple DRAM Chips and other components (such as resistors, capacitors, etc.) onto a printed circuit board. The majority of the cost of a DRAM Module is the cost of the DRAM Chips. As a result, prices for DRAM Modules generally track the price of DRAM Chips. In other words, higher DRAM Chip prices increase the cost and price of DRAM Modules.

76. Once a DRAM Module leaves its place of manufacture/assembly, it remains essentially unchanged as it moves through the distribution system. It may be installed into a computer before the computer is sold to an end-buyer or the DRAM Module may be purchased as an add-on module and installed into a computer.

77. Like the DRAM Chips they incorporate, DRAM Modules are commodities; they vary very little from manufacturer to manufacturer. Standardization and commoditization in the DRAM Module industry leads to benefits for OEMs including price competition, not being limited to a single source for components, and convergence in technologies.

78. Under the hypothetical monopolist test, DRAM Modules are a market. A hypothetical monopolist could profitably raise DRAM Module prices by a SSNIP.

79. Customers have no reasonable alternatives to DRAM Modules when making computers. Standardization has allowed the computer industry to design-in

DRAM technology into computers. As a result, OEMs are unlikely to switch to an alternative form of computer memory.

80. Like the market for DRAM Chips, the market for DRAM Modules is highly concentrated. The HHI score for the DRAM Module market now exceeds 3,300. Over the years, the number of DRAM Module makers has steadily decreased. The four most significant DRAM Module suppliers remaining today are the three vertically integrated DRAM Chip suppliers in the DRAM Chip oligopoly—Samsung, Hynix and Micron—and third-party DRAM Module maker Kingston.

81. As concentration has increased, Samsung has further strengthened its dominance in the DRAM Module market. Indeed, Samsung's share of the market for DRAM Modules for computers now exceeds 50%.

82. The market for DRAM Modules also has high and increasing barriers to entry, for many of the same reasons that the DRAM Chip market has barriers to entry. The entrance of new competitors is highly unlikely.

83. Economy of scale is a significant barrier, for example. The three largest DRAM Module suppliers (Samsung, Hynix and Micron) also have 95% of the DRAM Chip market and are vertically integrated firms. A new entrant to the DRAM Module market likely would need to be a vertically integrated supplier in order to compete. But, as discussed above, the capital investments required to become a vertically integrated supplier are enormous and would entail significant risk. The same cross-licensing issues related to DRAM Chip technology would apply, making entry unlikely. If a new entrant entered the DRAM Module on a small scale (and not as a vertically integrated supplier), they would be at a substantial cost disadvantage.

<u>Kingston's DRAM Module Business</u>

84. Kingston has built its business buying DRAM Chips from DRAM Chip manufacturers and making DRAM Modules to sell to computer industry customers. Kingston's business depends on a supply of DRAM Chips from one or more DRAM

Chip manufacturers. DRAM Module customers, such as Dell, Hewlett Packard, and others, value Kingston as a DRAM Module supplier.

85. There are two complementary facets to Kingston's business. The primary business is as a third-party maker and seller of DRAM Modules. For this business, Kingston must buy DRAM Chips and other components from suppliers. The second business is the "buy and hold" DRAM Module business. At the request and direction of some of its large OEM customers, Kingston issues purchase orders from DRAM Modules manufactured by Samsung, Hynix and Micron and holds them in inventory until the OEMs need them.

86. Kingston is the most significant third-party non-integrated DRAM Module supplier in the DRAM Module market. To the extent there are other third-party DRAM Module suppliers, they are considerably smaller than Kingston and do not impose significant competition on the production and sale of DRAM Modules by Samsung, Hynix and Micron.

87. Unlike Samsung, Hynix and Micron, the dominant DRAM Module suppliers, third-party DRAM Module manufacturer Kingston does not manufacture DRAM Chips. Thus, in order to make its DRAM Modules, Kingston must purchase DRAM Chips from the major DRAM Chip manufacturers, such as Samsung, Hynix or Micron. Smaller DRAM Chip manufacturers are too small and inefficient to supply Kingston with the volumes required to meet the demand for its products.

88. As part of Kingston's business strategy and for efficiency, during periods of excess supply of DRAM Chips, Kingston purchases large quantities of DRAM Chips at reduced prices to have on hand for manufacturing DRAM Modules. This model affords Kingston the ability to manufacture and sell DRAM Modules to its customers at lower prices than its competition, even in times of high demand (and corresponding high prices) for DRAM Chips and DRAM Modules. Kingston's participation in the market therefore acts as a check on the monopoly power of Samsung in both the DRAM Chip and DRAM Module market.

`

89. In some instances, Kingston is directed by OEMs to meet particular specifications for DRAM Modules. The OEM may direct Kingston to purchase DRAM Chips from a particular DRAM Chip supplier or may directly negotiate the purchase of DRAM Chips itself and consign the DRAM Chips to Kingston for installation into DRAM Modules.

90. In the second part of its business—the buy and hold business—Kingston purchases, on behalf of OEM customers, DRAM Modules manufactured by other companies, particularly Samsung, Hynix and Micron, and holds them in inventory until the OEMs need them. (Often the DRAM Modules are purchased during times of high supply and low demand, when prices are low.) The DRAM Modules that Kingston purchases for the buy and hold business are purchased as completed products; Kingston does further modify these DRAM Modules.

91. Kingston's unique financial position allows it to perform this valuable function for its customers.

92. Kingston's strategy for its buy and hold DRAM Module business includes periodically purchasing large quantities of DRAM Modules when there is excess supply of DRAM Modules in the market at lower cost and holding them in inventory until needed by Kingston's customers. Kingston's cash-flow position allows it to purchase DRAM Modules when supply is high and prices are low, which is beneficial to the OEMs. In times of high DRAM Module prices, the OEMs are able to source DRAM Modules from Kingston at below-market prices. Through this proactive cost strategy, Kingston is able to compete with the vertically-integrated DRAM Module manufacturers and checks their ability to unreasonably raise DRAM Module prices.

93. Kingston's buy and hold business is an efficient model that moderates prices in the DRAM Module market for its customers.

94. The two aspects of Kingston's business (manufacturing Kingston-brand DRAM Modules and buying and holding in inventory DRAM Modules manufactured

by other suppliers), support one another. Kingston could not continue its buy and hold business without its business of buying DRAM Chips and independently making and selling DRAM Modules, and vice versa.

95. Kingston provides an important and unique constraint on Samsung's market power. Kingston's business model and sophisticated planning tools enable it to optimize its production and to make the best use of the components available at any given time for discounted prices. In this way, Kingston provides an efficient and valuable outlet for makers of DRAM Chips—particularly Hynix and Micron, which are smaller than Samsung—during times of low demand and high supply.

96. In its dual roles as (1) a third-party DRAM Module maker and (2) a source of DRAM Module inventory (through its buy and hold business), Kingston also presently imposes a significant competitive constraint on the prices of DRAM Modules produced by Samsung, Hynix and Micron.

<u>History of the Qimonda Portfolio</u>

97. In May 2015, Polaris acquired from Infineon a large portfolio of patents owned by former Infineon subsidiary Qimonda. According to publicly available information, the Qimonda Portfolio included more than 7,000 patents, many of which purport to cover various features of DRAM functionality.

98. Before entering bankruptcy in 2009, Qimonda was a sizable DRAM competitor, ranking at one point second in the DRAM Chip market, behind only Samsung. Qimonda manufactured both DRAM Chips and DRAM Modules and allegedly practiced the patents in the Qimonda Portfolio, unlike current owner Polaris, which exists solely as a patent assertion entity.

99. Upon information and belief, Qimonda had numerous cross-licenses with competitors that enabled competition for DRAM Chips, DRAM Modules and other products incorporating DRAM. The suppliers from which Kingston has purchased or does purchase DRAM Chips (and DRAM Modules for the buy and hold business) had and continue to have licenses to the patents asserted by Polaris in this action from the

`

Qimonda Portfolio. Upon information and belief, Samsung and Polaris are fully aware of the numerous encumbrances on the Qimonda Portfolio. Upon information and belief, these cross-licenses are royalty free.

100. During the Qimonda bankruptcy proceedings, there were multiple attempts to monetize the Qimonda Portfolio. A recurring concern of potential buyers was the extent of the encumbrances on the patents. Infineon eventually acquired the Qimonda Portfolio for €125 million in September 2014. When Infineon acquired the Qimonda Portfolio, many of the encumbrances still remained, including a legacy license to Samsung. By 2015, it became apparent these patents had little value because they were sold to Polaris for only €33 million.

101. In May 2015, Samsung and Polaris entered into an agreement through which Samsung agreed to pay half of the purchase price (up to €16 million) required for Polaris to acquire the Qimonda Portfolio from Infineon.

102. Polaris and Samsung did not gain the DRAM-related patents at issue by any innovative activity on their parts. To extract value from the portfolio, Polaris will collect royalties from existing encumbrances on the patents, try to extract new licenses from existing manufacturers and/or bring patent infringement suits against non-license holders to obtain additional licenses or lump sum settlement payments.

Conspiratorial and Exclusionary Conduct by Samsung and Polaris

103. In 2008, Samsung tried but was unable to drive Kingston out of the DRAM Module market when it discriminatorily stopped selling DRAM Chips to Kingston. Samsung has no legitimate reason to refuse to sell DRAM Chips to Kingston. Upon information and belief, other existing DRAM Module makers (including other smaller third-party DRAM Module makers) are still allowed to purchase DRAM Chips from Samsung.

104. Samsung's conduct has harmed (1) Kingston, which now has limited supply sources from which to purchase DRAM Chips, as the outputs from Hynix and Micron are at much smaller scales than Samsung, and has to pay higher prices to buy

`

DRAM Chips from time to time, as well as (2) the OEMs with which Samsung and Kingston do business.

105. Samsung is now coupling its unlawful refusal to deal with conspiratorial conduct engaged in with Polaris to further weaken Kingston and/or drive Kingston from the market. In concert with Polaris, Samsung is trying to force Kingston to take unnecessary and anticompetitive licenses to the Qimonda Portfolio (which violate both companies' FRAND commitments) and is subjecting Kingston to discriminatory and baseless patent infringement litigation.

106. Polaris has incentive to assert the Qimonda Portfolio against Kingston (and others in the DRAM Chip and DRAM Module markets) in order to return the €16 million payment Samsung provided to facilitate the purchase of the Qimonda Portfolio. Because Polaris must pay Samsung five percent (5%) of the royalties it extracts on the Qimonda Portfolio, Polaris' royalty demands include the additional and anticompetitive royalty that must be paid to Samsung.

107. Under the terms of the conspiratorial agreement, Samsung cannot earn a profit or a return on its investment in the Qimonda Portfolio (absent the benefit of excluding Kingston)—Polaris' repayment obligation is capped at the initial €16 million amount and not subject to interest accrual. Thus, Samsung essentially paid nothing to acquire the Qimonda Portfolio, pays no royalties on the patents and earns no financial return on the patents. By any financial measure, the patents are thus valueless.

108. Moreover, any royalties charged by Polaris on the Qimonda Portfolio (to entities other than Samsung) are discriminatory; Samsung has been granted a royalty-free license and obtained options to influence and/or control the enforcement of certain patents in the portfolio.

109. When it was acquired by Polaris and Samsung, the Qimonda Portfolio was burdened with cross licenses as well as with commitments to license standard-

essential technology on FRAND terms. The Qimonda Portfolio's previous owner, Infineon, is a member of JEDEC. So too is Samsung.

110. JEDEC is one of the leading standard-setting organizations for the semiconductor industry. JEDEC member companies work collaboratively to develop and maintain industry-wide technical standards for semiconductor products, including DRAM and others.

111. More than 250 companies and thousands of individuals actively participate in JEDEC's 50-plus committees to develop and maintain standards to meet industry and user needs for semiconductor and other devices. Member companies include manufacturers, purchasers and users of the products.

112. The technical standards developed and maintained by JEDEC permit products made by different manufacturers to be interchangeable and interoperable with one another, thus reducing costs and enabling competition. Standard-setting produces cost advantages for manufactures and consumers. Manufacturers of the standardized product are able to sell the product on a broad, industry-wide basis, and can benefit from lower costs of production. Buyers and consumers benefit from the competition of multiple suppliers of the standardized product.

113. Vital to JEDEC's standard-setting work is the early disclosure of actual or potential patent rights relevant to the particular standard. Full disclosure enables JEDEC, when considering a possible standard to adopt, to decide (1) whether to standardize intellectual property subject to patent rights if appropriate written assurances are provided that the patent holder will make the required technology available under reasonable terms and conditions that are demonstrably free of any unfair discrimination or (2) whether JEDEC should instead utilize alternative technology that is not burdened by existing (or likely future) patent rights.

114. JEDEC thus requires members to disclose all patents that practice on a JEDEC-adopted standard and also to license those patents on FRAND terms. Upon

information and belief, as members of JEDEC, Samsung and Infineon would have had to disclose and license on FRAND terms their DRAM-related patents.

115. Upon information and belief, Infineon's JEDEC commitments vis a vis the Qimonda Portfolio transferred with the portfolio when it was acquired by Samsung and Polaris. Samsung and Polaris are bound by those commitments and were aware of those commitments when they conspired to buy the Qimonda Portfolio. Polaris and Samsung therefore knew that the Qimonda Portfolio could not be asserted against DRAM Module manufacturers and/or that any royalties could not be higher than the royalties paid by JEDEC-member Samsung.

116. Earlier this year, shortly after Polaris and Samsung conspired to acquire the Qimonda Portfolio, Polaris filed patent infringement litigation against Kingston. Samsung is identified as having an interest in Polaris' suit against Kingston.

117. Polaris' complaint alleges patent infringement relating to Kingston's manufacture and sale of DRAM Modules. The litigation seeks to force Samsung's rival Kingston to pay discriminatory royalties to license the Qimonda Portfolio.

118. Kingston has never before been required to obtain a license to manufacture DRAM Modules (which contain DRAM Chips that, upon information and belief, are already subject to cross-licensing). But now, through its conspiratorial arrangement with Polaris, Samsung is looking for discriminatory royalties to be extracted from its rival Kingston with a portion of those royalties going to Samsung. The conduct by Polaris and Samsung has the effect of raising rival Kingston's costs and reducing competitive constraints on Samsung's ability to further dominate the DRAM industry.

119. Upon information and belief, but for the conspiratorial agreement with Samsung, Polaris would not have brought suit against Kingston.

120. The terms of the agreement between Polaris and Samsung, entitle Samsung to identify up to 15 patents from the DRAM portfolio and to either (1) receive from Polaris "an exclusive license" to the selected patents "sufficient to

`

enforce [the selected patents] upon a Third Party mutually agreed upon by Samsung and [Polaris]" or (2) have Polaris file patent infringement litigations against third parties mutually agreed upon by Samsung and Polaris. The agreement provides for the possibility that Polaris will receive "remuneration" from Samsung for litigations filed at Samsung's request.

121. The conspiratorial agreement is an attempt to maintain and enhance Samsung's monopoly power in the DRAM Chip and DRAM Module markets and enables Samsung, through Polaris, to discriminatorily target for exclusion Kingston and other rivals. Samsung knew the Qimonda Portfolio had little direct financial value, as evidenced by the exponentially low sales price of approximately €33 million (compared to the approximately €125 million Infineon previously paid to acquire the Qimonda Portfolio from restructuring Qimonda), the fact that Samsung pays no royalties on the portfolio and will have paid nothing to acquire its interest in the portfolio. Moreover, Samsung already had pre-existing cross licenses to the portfolio. Thus, the value for Samsung is derived solely from acquiring access (through Polaris) to 7,000 patents that can be baselessly asserted against Samsung's rivals and the attendant costs of defending those lawsuits for companies like Kingston. Upon information and belief, the Qimonda Portfolio covers not only DRAM-related technology, but also key technology for other electronic components that Samsung also manufactures and sells. The suit against Kingston likely is just the first in a long line of Qimonda Portfolio-based infringement suits that will be filed against Samsung's rivals.

122. Samsung has funded an entity—Polaris—whose sole motivation for acquiring the patent portfolio is to extract anticompetitive and discriminatory royalty payments by forcing companies in the DRAM industry to enter into patent licenses and/or bring sham patent infringement litigation against entities that are a threat to Samsung's dominant position or that Samsung wishes to oust in order to maintain or enhance its monopoly.

`

123. Taken as a whole, Samsung and Polaris have engaged in conspiratorial and exclusionary conduct that has no legitimate purpose. First, Samsung discriminatorily refused to deal with Kingston. Then, Samsung and Polaris conspired to acquire a patent portfolio already encumbered with numerous cross licenses and subject to FRAND commitments, with the express purpose of substantially lessening competition in the DRAM Chip and DRAM Module markets. Through the arrangement, Samsung obtains a royalty-free license to the portfolio, payments funded by Polaris' assertion of the portfolio against Samsung's competitors in the industry, and the ability to influence and/or control assertion of the portfolio against its rivals.

124. The suit filed against Kingston specifically demands that Kingston take a license to at least the six asserted patents, despite that Kingston has never before had to obtain a license to manufacture DRAM Modules. Additionally, Kingston would pay a royalty that is discriminatory (Samsung pays no royalty on the entire Qimonda Portfolio, after receiving its 5% share of royalties collected by Polaris) and anticompetitive (to the extent that it forecloses Kingston from operating as a check on Samsung's prices). Such a royalty would also harm competition and consumers by effectively forcing Kingston to raise its prices in order to compensate for the unfair royalty.

125. The infringement suit against Kingston also violates Polaris' and Samsung's JEDEC commitments to license standard-essential technology on FRAND terms. Kingston's DRAM Modules are and have been made according to the JEDEC standards and are interchangeable with different brands of DRAM Modules, for use in different brands of computers.

126. By damaging Kingston's business through its conspiratorial conduct and the bringing of baseless patent infringement allegations against Kingston, Samsung seeks to increase its market share and monopoly power in the DRAM Chip and DRAM Module Market.

127. No suits were filed against Hynix or Micron, both of which compete in the DRAM Module market, or against any of the other much smaller third-party DRAM Module manufacturers. Thus far, the only target is Kingston, which has the financial capability to purchase DRAM Chips in bulk or large quantities to take advantage of price drops to produce lower cost DRAM Modules and to operate a buy and hold DRAM Module business for computer makers. These advantages in Kingston's business model thus constrain Samsung's ability to raise prices and control the DRAM Chip and DRAM Module markets. Such exclusionary and discriminatory tactics threaten to and do harm competition.

128. Further, nothing prevents Samsung and Polaris from asserting that Kingston has infringed other patents in the Qimonda Portfolio beyond the six directly named in Polaris' current complaint. And, the risk of successive and discriminatory litigation is not limited to Kingston—Polaris and Samsung can wage their patent war against all of the other remaining DRAM Module manufacturers and potentially others in the electronic components industry more generally given the breadth of the technology covered by the Qimonda Portfolio.

Injury to Kingston and to the DRAM Chip and DRAM Module Markets

129. Taken together, the conspiratorial, discriminatory and exclusionary conduct by Polaris and Samsung harms Kingston in multiple ways.

130. Samsung's discriminatory refusal to deal with Kingston forces Kingston to source DRAM Chips only from other DRAM Chip suppliers, such as Hynix and Micron, which are all smaller than Samsung and do not have the manufacturing capacity or technical capabilities of Samsung, thus weakening Kingston's ability to serve as a market check on Samsung's monopoly power and ability to raise prices to supra-competitive levels.

131. On top of Samsung's refusal to deal, Polaris and Samsung now have conspired to acquire the Qimonda Portfolio and to discriminatorily wield it against Samsung's rival Kingston.

`

132. The conspiratorial agreement between Samsung and Polaris incentivizes Polaris to assert the Qimonda Portfolio against Kingston in order to extract anticompetitive royalties from Kingston—a key competitor to Samsung in the DRAM Module market and to pay a portion of those royalties to Samsung.

133. Forcing Kingston to pay unnecessary and discriminatory royalties limits—and threatens to eliminate—Kingston's financial ability to offer lower price DRAM Modules to the computer industry and to serve as a market check on Samsung. This constitutes not only injury to Kingston but also harms competition.

134. Samsung and Polaris have conspired to file discriminatory, anticompetitive and baseless patent litigation against Kingston.

135. The litigation violates the FRAND commitments held by Samsung and Polaris, further increases Kingston's costs discriminatorily, causing injury to Kingston, its customers, Hynix and Micron and to competition.

136. Weakening or excluding Kingston decreases or eliminates the ability of Kingston to buy DRAM Chips in bulk from the limited number of other available suppliers, which have significantly smaller output capacity than Samsung. It also reduces the ability of Kingston to buy DRAM Chips during periods of slow demand. The effect is to increase the costs of production for Hynix and Micron, further enhancing the monopoly of Samsung and enabling Samsung to increase its prices.

137. Buyers of DRAM Modules, including Dell, Hewlett Packard, and others also suffer as the result of Samsung's and Polaris' conduct. Raising Kingston's costs in turn raises costs for Kingston's customers. Ultimately, this will impact end-users, who also will see higher prices. Moreover, if Samsung and Polaris force Kingston to exit the market, Kingston's customers will lose Kingston not only as a third-party maker of DRAM Modules, but also as a valuable source of DRAM Module inventory.

138. Regardless of any of the above, Kingston also must expend significant costs in order to defend itself against the discriminatory patent litigation brought by Polaris at Samsung's behest, a class of damages unique to Kingston at present but that

would also be suffered by any other company Polaris and Samsung choose to target. Moreover, given the number (7,000) of patents in the Qimonda Portfolio, there will potentially be suit after suit by Polaris against Kingston, other DRAM Module manufacturers and potentially others in the electronics components industry, particularly companies that compete with Samsung.

139. The conspiratorial, discriminatory and exclusionary conduct by a monopolist, Samsung, and co-conspirator, Polaris, violates Section 1 of the Sherman Act, Section 2 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 2 and 18, as well as Section 16750 of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*. and Section 17200 of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,157,589)**

140. Kingston incorporates by reference the allegations contained in paragraphs 1 through 139 above, as though set forth in full.

141. This is an action for a declaratory judgment of non-infringement by Kingston of the ’589 Patent pursuant to 28 U.S.C. §§ 2201 and 2202.

142. Polaris has alleged that Kingston directly infringes, indirectly infringes by inducement, literally and/or under the doctrine of equivalents, the ’589 Patent.

143. The filing of this action by Polaris, and Kingston’s First Affirmative Defense, create an actual and justiciable controversy concerning the non-infringement of the ’589 Patent.

144. Kingston seeks a declaration under 28 U.S.C. §§ 2201, *et seq*. that it does not infringe any claim of the ’589 Patent.

`

**SECOND CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,438,057)**

145. Kingston incorporates by reference the allegations contained in paragraphs 1 through 144 above, as though set forth in full.

146. This is an action for a declaratory judgment of non-infringement by Kingston of the ’057 Patent pursuant to 28 U.S.C. §§ 2201 and 2202.

147. Polaris has alleged that Kingston directly infringes, indirectly infringes by inducement, literally and/or under the doctrine of equivalents, the ’057 Patent.

148. The filing of this action by Polaris, and Kingston’s First Affirmative Defense, create an actual and justiciable controversy concerning the non-infringement of the ’057 Patent.

149. Kingston seeks a declaration under 28 U.S.C. §§ 2201, *et seq*. that it does not infringe any claim of the ’057 Patent.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,850,414)**

150. Kingston incorporates by reference the allegations contained in paragraphs 1 through 149 above, as though set forth in full.

151. This is an action for a declaratory judgment of non-infringement by Kingston of the ’414 Patent pursuant to 28 U.S.C. §§ 2201 and 2202.

152. Polaris has alleged that Kingston directly infringes, indirectly infringes by inducement, literally and/or under the doctrine of equivalents, the ’414 Patent.

153. The filing of this action by Polaris, and Kingston’s First Affirmative Defense, create an actual and justiciable controversy concerning the non-infringement of the ’414 Patent.

154. Kingston seeks a declaration under 28 U.S.C. §§ 2201, *et seq*. that it does not infringe any claim of the ’414 Patent.

`

**FOURTH CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,206,978)**

155. Kingston incorporates by reference the allegations contained in paragraphs 1 through 154 above, as though set forth in full.

156. This is an action for a declaratory judgment of non-infringement by Kingston of the ’978 Patent pursuant to 28 U.S.C. §§ 2201 and 2202.

157. Polaris has alleged that Kingston directly infringes, indirectly infringes by inducement, literally and/or under the doctrine of equivalents, the ’978 Patent.

158. The filing of this action by Polaris, and Kingston’s First Affirmative Defense, create an actual and justiciable controversy concerning the non-infringement of the ’978 Patent.

159. Kingston seeks a declaration under 28 U.S.C. §§ 2201, *et seq*. that it does not infringe any claim of the ’978 Patent.

**FIFTH CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,315,454)**

160. Kingston incorporates by reference the allegations contained in paragraphs 1 through 159 above, as though set forth in full.

161. This is an action for a declaratory judgment of non-infringement by Kingston of the ’454 Patent pursuant to 28 U.S.C. §§ 2201 and 2202.

162. Polaris has alleged that Kingston directly infringes, indirectly infringes by inducement, literally and/or under the doctrine of equivalents, the ’454 Patent.

163. The filing of this action by Polaris, and Kingston’s First Affirmative Defense, create an actual and justiciable controversy concerning the non-infringement of the ’454 Patent.

164. Kingston seeks a declaration under 28 U.S.C. §§ 2201, *et seq*. that it does not infringe any claim of the ’454 Patent.

`

## SIXTH CLAIM FOR RELIEF

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,334,150)**

165. Kingston incorporates by reference the allegations contained in paragraphs 1 through 164 above, as though set forth in full.

166. This is an action for a declaratory judgment of non-infringement by Kingston of the ’150 Patent pursuant to 28 U.S.C. §§ 2201 and 2202.

167. Polaris has alleged that Kingston directly infringes, indirectly infringes by inducement, literally and/or under the doctrine of equivalents, the ’150 Patent.

168. The filing of this action by Polaris, and Kingston’s First Affirmative Defense, create an actual and justiciable controversy concerning the non-infringement of the ’150 Patent.

169. Kingston seeks a declaration under 28 U.S.C. §§ 2201, *et seq*. that it does not infringe any claim of the ’150 Patent.

## SEVENTH CLAIM FOR RELIEF

**(Declaratory Judgment of Invalidity and Unenforceability of U.S. Patent No. 6,157,589)**

170. Kingston incorporates by reference the allegations contained in paragraphs 1 through 169 above, as though set forth in full.

171. Polaris purports to be the assignee and owner of the entire right, title and interest in the ’589 Patent.

172. Polaris has sued Kingston in the present action, alleging infringement of the ’589 Patent. Thus, an immediate, real, and justiciable controversy exists between Polaris and Kingston with respect to the alleged infringement, validity, and enforceability of the ’589 Patent.

173. The claims of the ’589 Patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

174. Kingston also asserts this Counterclaim against Polaris for declaratory relief that the ’589 Patent is unenforceable due to patent/licensing exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

175. Polaris served the Complaint on Kingston with knowledge that the ’589 Patent was unenforceable due to exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

176. Kingston seeks a judgment declaring that the asserted claims of the ’589 Patent are invalid and unenforceable.

**EIGHTH CLAIM FOR RELIEF**

**(Declaratory Judgment of Invalidity and Unenforceability of U.S. Patent No. 6,438,057)**

177. Kingston incorporates by reference the allegations contained in paragraphs 1 through 176 above, as though set forth in full.

178. Polaris purports to be the assignee and owner of the entire right, title and interest in the ’057 Patent.

179. Polaris has sued Kingston in the present action, alleging infringement of the ’057 Patent. Thus, an immediate, real, and justiciable controversy exists between Polaris and Kingston with respect to the alleged infringement, validity, and enforceability of the ’057 Patent.

180. The claims of the ’057 Patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

181. Kingston also asserts this Counterclaim against Polaris for declaratory relief that the ’057 Patent is unenforceable due to patent/licensing exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

182. Polaris served the Complaint on Kingston with knowledge that the ’057 Patent was unenforceable due to exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

183. Kingston seeks a judgment declaring that the asserted claims of the ’057 Patent are invalid and unenforceable.

**NINTH CLAIM FOR RELIEF**

**(Declaratory Judgment of Invalidity and Unenforceability of U.S. Patent No. 6,850,414)**

184. Kingston incorporates by reference the allegations contained in paragraphs 1 through 183 above, as though set forth in full.

185. Polaris purports to be the assignee and owner of the entire right, title and interest in the ’414 Patent.

186. Polaris has sued Kingston in the present action, alleging infringement of the ’414 Patent. Thus, an immediate, real, and justiciable controversy exists between Polaris and Kingston with respect to the alleged infringement, validity, and enforceability of the ’414 Patent.

187. The claims of the ’414 Patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

188. Kingston also asserts this Counterclaim against Polaris for declaratory relief that the ’414 Patent is unenforceable due to patent/licensing exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

189. Polaris served the Complaint on Kingston with knowledge that the ’414 Patent was unenforceable due to exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

190. Kingston seeks a judgment declaring that the asserted claims of the ’414 Patent are invalid and unenforceable.

`

**<u>TENTH CLAIM FOR RELIEF</u>**

**(Declaratory Judgment of Invalidity and Unenforceability of U.S. Patent No. 7,206,978)**

191. Kingston incorporates by reference the allegations contained in paragraphs 1 through 190 above, as though set forth in full.

192. Polaris purports to be the assignee and owner of the entire right, title and interest in the ’978 Patent.

193. Polaris has sued Kingston in the present action, alleging infringement of the ’978 Patent. Thus, an immediate, real, and justiciable controversy exists between Polaris and Kingston with respect to the alleged infringement, validity, and enforceability of the ’978 Patent.

194. The claims of the ’978 Patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

195. Kingston also asserts this Counterclaim against Polaris for declaratory relief that the ’978 Patent is unenforceable due to patent/licensing exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

196. Polaris served the Complaint on Kingston with knowledge that the ’978 Patent was unenforceable due to exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

197. Kingston seeks a judgment declaring that the asserted claims of the ’978 Patent are invalid and unenforceable.

**<u>ELEVENTH CLAIM FOR RELIEF</u>**

**(Declaratory Judgment of Invalidity and Unenforceability of U.S. Patent No. 7,315,454)**

198. Kingston incorporates by reference the allegations contained in paragraphs 1 through 197 above, as though set forth in full.

199. Polaris purports to be the assignee and owner of the entire right, title and interest in the ’454 Patent.

200. Polaris has sued Kingston in the present action, alleging infringement of the ’454 Patent. Thus, an immediate, real, and justiciable controversy exists between Polaris and Kingston with respect to the alleged infringement, validity, and enforceability of the ’454 Patent.

201. The claims of the ’454 Patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

202. Kingston also asserts this Counterclaim against Polaris for declaratory relief that the ’454 Patent is unenforceable due to patent/licensing exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

203. Polaris served the Complaint on Kingston with knowledge that the ’454 Patent was unenforceable due to exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

204. Kingston seeks a judgment declaring that the asserted claims of the ’454 Patent are invalid and unenforceable.

**TWELFTH CLAIM FOR RELIEF**

**(Declaratory Judgment of Invalidity and Unenforceability of U.S. Patent No. 7,334,150)**

205. Kingston incorporates by reference the allegations contained in paragraphs 1 through 204 above, as though set forth in full.

206. Polaris purports to be the assignee and owner of the entire right, title and interest in the ’150 Patent.

207. Polaris has sued Kingston in the present action, alleging infringement of the ’150 Patent. Thus, an immediate, real, and justiciable controversy exists between Polaris and Kingston with respect to the alleged infringement, validity, and enforceability of the ’150 Patent.

`

208. The claims of the ’150 Patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

209. Kingston also asserts this Counterclaim against Polaris for declaratory relief that the ’150 Patent is unenforceable due to patent/licensing exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

210. Polaris served the Complaint on Kingston with knowledge that the ’150 Patent was unenforceable due to exhaustion, estoppel, unclean hands and/or patent misuse, and laches.

211. Kingston seeks a judgment declaring that the asserted claims of the ’150 Patent are invalid and unenforceable.

## <u>THIRTEENTH CLAIM FOR RELIEF</u>

### (Breach of Contract)

212. Kingston incorporates by reference the allegations contained in paragraphs 1 through 211 above, as though set forth in full.

213. On information and belief, JEDEC has required committee members and participants to disclose patents that are potentially essential to the standards being developed by JEDEC, and to agree to license such patents either at no charge or on RAND terms, or it “must withdraw from the committee no later than one-hundred twenty (120) calendar days” and risk having JEDEC reject the standard in favor of a design-around.

214. On information and belief, Infineon is a member of at least JEDEC’s JC-42 Solid State Memories and JC-45 DRAM Modules Committees.

215. On information and belief, Infineon was under a contractual obligation to disclose any potential SEPs to at least JEDEC’s JC-42 Solid State and JC-45 DRAM Modules Committees and to abide by royalty-free or RAND licensing terms with respect to any SEPs.

216. Kingston is informed and believes, and on that basis alleges, that for consideration, including membership and participation in JEDEC, Infineon entered into an express and/or implied contract with JEDEC, to which others, including Kingston, are third-party beneficiaries.

217. On information and belief, Polaris took the patents it acquired from Infineon, including the Asserted Patents, subject to RAND and related encumbrances from Infineon.

218. To the extent that any of the Asserted Patents are essential to the implementation of JEDEC standards, then Polaris has breached its obligation to license such patents on RAND terms.

219. Kingston has incurred damages and irreparable harm and will be further damaged in the future due to Polaris' breach of its contractual obligations. Polaris' breach of contract has injured Kingston, subjecting it to the choice of paying substantial litigation expenses, ceasing to manufacture the accused products, or paying greater than RAND royalties. Such damages include, without limitation: lost profits and lost opportunities; a reduction in output; the ongoing threat of having to pay unreasonable royalties; the costs of having to defend this lawsuit; and the threat of other lawsuits that may be brought by Polaris with regard to other SEPs it owns.

## FOURTEENTH CLAIM FOR RELIEF

**(Concerted Action Unreasonably Restraining Trade)**

**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

**(Against Counterclaim-Defendant Polaris and Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

220. Kingston incorporates by reference the allegations contained in paragraphs 1 through 219 above, as though set forth in full.

221. Kingston is informed and believes, and on that basis alleges, that there exists a contract, combination or conspiracy between and/or among Polaris and Samsung.

`

222. Kingston is informed and believes, and on that basis alleges, that the contract, combination or conspiracy unreasonably restrains and/or eliminates trade.

223. Kingston is informed and believes, and on that basis alleges, that the activities alleged herein involve products in the flow of interstate commerce and will substantially impact interstate commerce as computers containing DRAM Chips and DRAM Modules are sold throughout the United States.

224. Kingston is informed and believes, and on that basis alleges, that the restraint or elimination of trade, as alleged herein, has resulted in substantial harm to competition in the DRAM Chip and DRAM Module markets. These markets are global in scope and include the United States.

225. Kingston is informed and believes, and on that basis alleges, that Samsung is or was a horizontal competitor of Kingston in the DRAM Module market and, upon information and belief, has entered into the following agreements in restraint of trade with Polaris: an agreement to acquire the Qimonda Portfolio; an agreement to discriminatorily enforce the Qimonda Portfolio against Kingston and other competitors of Samsung in the DRAM Chip and DRAM Module markets; an agreement to try to extract from Kingston discriminatory and anticompetitive royalties on the Qimonda Portfolio; an agreement to violate their FRAND commitments with respect to DRAM-technology and the Qimonda Portfolio; and an agreement to raise the costs of Samsung's rival Kingston, as well as others in the DRAM Chip and DRAM Module markets and to weaken and/or eliminate competition by Kingston.

226. Kingston is informed and believes, and on that basis alleges, that the agreement and/or contract between and among Polaris and Samsung constitutes a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

227. By engaging in the contract, combination or conspiracy, Polaris and Samsung are attempting to unreasonably restrain trade and suppress price and other competition in the DRAM Chip and DRAM Module markets.

`

228. Kingston is informed and believes, and on that basis alleges, that Polaris' and Samsung's actions have had or will have the following effects: competition in the DRAM Chip and DRAM Module markets have and will continue to be unreasonably impaired and restrained, thereby affecting interstate commerce; both markets will become even more highly concentrated and barriers to entry will be further increased; costs for Samsung will be reduced, while costs for rivals such as Kingston have and will continued to be increased.

229. Kingston is informed and believes, and on that basis alleges, that unless the conduct of Polaris and Samsung is declared to be unlawful, Kingston is and will continue to be injured in its business and property and will suffer substantial and irreparable harm.

**FIFTEENTH CLAIM FOR RELIEF**

**(Attempt to Monopolize Trade, Monopolization of Trade in the DRAM Chip Market)**

**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**

**(Against Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

230. Kingston incorporates by reference the allegations contained in paragraphs 1 through 229 above, as though set forth in full.

231. Kingston is informed and believes, and on that basis alleges, that the DRAM Chip market is a valid antitrust market. The market is global in scope and includes the United States.

232. Kingston is informed and believes, and on that basis alleges, that the conduct complained of herein occurred in or affected interstate commerce.

233. Kingston is informed and believes, and on that basis alleges, that Samsung willfully acted to attempt to acquire and maintain monopoly power in the relevant DRAM Chips market by engaging in anticompetitive conduct.

234. Kingston is informed and believes, and on that basis alleges, that Samsung willfully acted with the specific intent to monopolize the relevant DRAM Chips market and that there is a dangerous probability of Samsung achieving and/or further enhancing monopoly power in the relevant DRAM Chip market and to lessen and/or destroy competition in that market.

235. Kingston is informed and believes, and on that basis alleges, that Samsung has intentionally attempted to obtain, and has obtained monopoly power and the ability to control prices in the DRAM Chip market. Specifically, Samsung has refused and refuses to sell DRAM Chips to rival Kingston, and Samsung and Polaris have improperly acquired control of the Qimonda Portfolio and plan to and have wielded the portfolio against Samsung's rival Kingston in order to raise Kingston's costs, reduce competition and further enhance Samsung's monopoly power and ability to raise and control prices in the DRAM Chip market.

236. Samsung's unlawful refusal to sell DRAM Chips to Kingston constitutes an attempt to further monopolize and monopolizes the DRAM Chip market. By harming Kingston, Samsung's conduct has the further effect of harming Samsung's rivals in the DRAM Chip market, who will lose a valuable and important customer if Kingston is significantly weakened and/or eliminated.

237. Kingston is informed and believes, and on that basis alleges, that Samsung possesses monopoly in the relevant DRAM Chip market.

238. Kingston is informed and believes, and on that basis alleges, that Samsung willfully acted to acquire and maintain and did acquire and maintain monopoly power in the relevant DRAM Chips market by engaging in anticompetitive conduct.

239. Kingston is informed and believes, and on that basis alleges, that the actions of Samsung have had or will have the following effects: competition in the DRAM Chip market has and will be impaired and restrained, and Samsung has unlawfully obtained the power to control prices and/or restrain and exclude

competition in the DRAM Chip and downstream markets, thereby affecting interstate commerce.

240. Kingston is informed and believes, and on that basis alleges, that unless the attempts and actions of Samsung (acting with Polaris) to impose unfair, unreasonable, discriminatory and anticompetitive royalty on Kingston are declared to be unlawful, Kingston is and will continue to be injured in its business and property and will suffer substantial and irreparable harm.

241. Kingston is informed and believes, and on that basis alleges, that unless the attempts and actions of Samsung to continue its exclusionary, discriminatory and anticompetitive refusal to sell DRAM Chips to Kingston are declared to be unlawful, Kingston is and will continue to be injured in its business and property and will suffer substantial and irreparable harm. Hynix and Micron also will suffer substantial and irreparable harm, as will Kingston's customers.

## <u>SIXTEENTH CLAIM FOR RELIEF</u>

**(Conspiracy to Monopolize Trade in the DRAM Chip Market)**

**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**

**(Against Counterclaim-Defendant Polaris and Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

242. Kingston incorporates by reference the allegations contained in paragraphs 1 through 241 above, as though set forth in full.

243. Kingston is informed and believes, and on that basis alleges, that the DRAM Chip market is a valid antitrust market. The market is global in scope and includes the United States.

244. Kingston is informed and believes, and on that basis alleges, that Samsung possesses monopoly power in the DRAM Chip market as it controls at least 50%, and possibly significantly more, of the market share in that market and has the ability to profitably increase prices by a SSNIP. In addition, by acquiring and controlling the Qimonda Portfolio, which contains patents relevant to DRAM-related

`

industry standards, Polaris and Samsung have monopoly power in the DRAM Chip market.

245. Kingston is informed and believes, and on that basis alleges, that the conduct of Polaris and Samsung, as described above, occurred in and/or affected interstate commerce.

246. Kingston is informed and believes, and on that basis alleges, that an agreement or mutual understanding exists between Polaris and Samsung to acquire or maintain monopoly power, control prices and reduce competition in the DRAM Chip market. Polaris and Samsung unlawfully acquired and/or maintained monopoly power in the DRAM Chip market by conspiring to acquire the Qimonda Portfolio and to discriminatorily wield the portfolio against Samsung's rivals, and particularly against Kingston, to extract anticompetitive and discriminatory royalties from Samsung's rivals and others in the relevant market and to file baseless, discriminatory and anticompetitive patent infringement litigation against Kingston to unlawfully acquire or maintain monopoly power.

247. Kingston is informed and believes, and on that basis alleges, that Polaris and Samsung knowingly, voluntarily, intentionally, and willfully entered into an agreement and mutual understanding to acquire or maintain monopoly power, control prices and reduce competition in the DRAM Chip market.

248. Kingston has been and will continue to be injured in its business and property because of the conspiracy to monopolize of Polaris and Samsung.

`

**SEVENTEENTH CLAIM FOR RELIEF**

**(Attempt to Monopolize Trade, Monopolization of Trade in the DRAM Module market)**

**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**

**(Against Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

249. Kingston incorporates by reference the allegations contained in paragraphs 1 through 248 above, as though set forth in full.

250. Kingston is informed and believes, and on that basis alleges, that the DRAM Module market is a valid antitrust market. The market is global in scope and includes the United States.

251. Kingston is informed and believes, and on that basis alleges, that the conduct complained of herein occurred in or affected interstate commerce.

252. Kingston is informed and believes, and on that basis alleges, that Samsung willfully acted to attempt to acquire and maintain monopoly power in the relevant DRAM Module market by engaging in anticompetitive conduct.

253. Kingston is informed and believes, and on that basis alleges, that Samsung willfully acted with the specific intent to monopolize the relevant DRAM Module market and that there is a dangerous probability of Samsung achieving and/or further enhancing monopoly power in the relevant DRAM Module market and to lessen and/or destroy competition in that market.

254. Kingston is informed and believes, and on that basis alleges, that Samsung has intentionally attempted to obtain, and has obtained monopoly power and the ability to control prices in the DRAM Module market. Specifically, Samsung, acting with Polaris, has improperly acquired control of the Qimonda Portfolio and plans to and has caused the portfolio to be wielded against Samsung's rival Kingston in order to raise Kingston's costs, reduce competition and further enhance Samsung's monopoly power and ability to raise and control prices in the DRAM Module market.

`

255. By harming Kingston, Samsung's conduct has the further effect of harming other competitors, customers and consumers in the DRAM Module market, who will lose a valuable and important third-party producer of DRAM Modules and check on Samsung's market power if Kingston is significantly weakened and/or eliminated.

256. Kingston is informed and believes, and on that basis alleges, that Samsung possesses monopoly in the relevant DRAM Module market.

257. Kingston is informed and believes, and on that basis alleges, that Samsung willfully acted to acquire and maintain and did acquire and maintain monopoly power in the relevant DRAM Module market by engaging in anticompetitive conduct.

258. Kingston is informed and believes, and on that basis alleges, that Samsung's actions have had or will have the following effects: competition in the DRAM Module market has and will be impaired and restrained, and Samsung has illegally obtained the power to control prices and/or restrain and exclude competition in the DRAM Module and downstream markets, thereby affecting interstate commerce.

259. Kingston is informed and believes, and on that basis alleges, that unless the attempts and actions of Samsung, acting with Polaris, to impose unfair, unreasonable, discriminatory and anticompetitive royalty on Kingston and to otherwise assert and/or enforce the Qimonda Portfolio in a discriminatory, exclusionary and anticompetitive way are declared to be unlawful, Kingston is and will continue to be injured in its business and property and will suffer substantial and irreparable harm.

260. Kingston is informed and believes, and on that basis alleges, that unless the attempts and actions of Samsung are declared unlawful, Hynix, Micron as well as other makers of DRAM Modules and customers in the DRAM Module market also will suffer substantial and irreparable harm.

`

## EIGHTEENTH CLAIM FOR RELIEF

**(Conspiracy to Monopolize Trade in the DRAM Module market)**

**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**

**(Against Counterclaim-Defendant Polaris and Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

261. Kingston incorporates by reference the allegations contained in paragraphs 1 through 260 above, as though set forth in full.

262. Kingston is informed and believes, and on that basis alleges, that the DRAM Module market is a valid antitrust market. The market is global in scope and includes the United States.

263. Kingston is informed and believes, and on that basis alleges, that Samsung possesses monopoly power in the DRAM Module market as it controls more than 50% of the market share for DRAM Modules for computers and has the ability to profitably increase prices by a SSNIP. In addition, by acquiring and controlling the Qimonda Portfolio, which contains patents relevant to DRAM-related industry standards, Polaris and Samsung have monopoly power in the DRAM Module market.

264. Kingston is informed and believes, and on that basis alleges, that the conduct of Polaris and Samsung, as described above, occurred in and/or affected interstate commerce.

265. Kingston is informed and believes, and on that basis alleges, that an agreement or mutual understanding exists between Polaris and Samsung to acquire or maintain monopoly power, control prices and reduce competition in the DRAM Module market. Polaris and Samsung unlawfully acquired and/or maintained monopoly power in the DRAM Module market by conspiring to acquire the Qimonda Portfolio and to discriminatorily wield the portfolio against Samsung's rivals, and particularly against Kingston, to extract anticompetitive and discriminatory royalties from Samsung's rivals and others in the relevant market and to file baseless,

`

discriminatory and anticompetitive patent infringement litigation against Kingston to unlawfully acquire or maintain monopoly power.

266. Kingston is informed and believes, and on that basis alleges, that Polaris and Samsung knowingly, voluntarily, intentionally, and willfully entered into an agreement and mutual understanding to acquire or maintain monopoly power, control prices and reduce competition in the DRAM Module market.

267. Kingston has been and will continue to be injured in its business and property because of the conspiracy to monopolize of Polaris and Samsung.

**<u>NINETEENTH CLAIM FOR RELIEF</u>**

**(Unlawful Acquisition of Assets)**

**(Section 7 of the Clayton Act, 15 U.S.C. § 18)**

**(Against Counterclaim-Defendant Polaris and Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

268. Kingston incorporates by reference the allegations contained in paragraphs 1 through 267 above, as though set forth in full.

269. Kingston is informed and believes, and on that basis alleges, that the DRAM Chip and DRAM Module markets are valid antitrust markets. The markets are global in scope and include the United States.

270. Kingston is informed and believes, and on that basis alleges, that Samsung and Polaris have unlawfully acquired interest in the Qimonda Portfolio, which upon information and belief includes patents pertinent to fundamental DRAM-related technology, including relevant industry standards.

271. Through its agreement with Polaris, Samsung has acquired and retained a financial and enforcement interest in the Qimonda Portfolio.

272. By retaining a financial and enforcement interest in the patent portfolio, Samsung has acquired part of the rights and financial assets tied to the patent portfolio, including the payment of certain royalties (extracted from its competitors) and the ability to enforce the patent rights in the future.

`

273. Samsung's legal and financial interest in the patent portfolio (a) tends to create a monopoly in the markets for DRAM Chips and DRAM Modules and (b) has the effect of substantially lessening competition in the DRAM Chip and DRAM Module market by, for example, increasing the costs of licensing the patents within the DRAM-related patent portfolio, which are then incorporated into the cost of the DRAM Modules.

274. Samsung's agreement with Polaris has no economic benefits that counterbalance the demonstrated anticompetitive effects of the agreement.

275. Samsung's agreement with Polaris constitutes an unlawful acquisition of assets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**TWENTIETH CLAIM FOR RELIEF**

**(Conspiracy to Unreasonably Restrain Trade)**

**(Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*.)**

**(Against Counterclaim-Defendant Polaris and Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

276. Kingston incorporates by reference the allegations contained in paragraphs 1 through 275 above, as though set forth in full.

277. Samsung and Polaris knowingly conspired to unreasonably restrain the trade in the U.S. and global DRAM Chip and DRAM Module markets by agreeing to jointly acquire the Qimonda Portfolio with the understanding that, upon the acquisition of the patent portfolio, Polaris would target enforcement of the patents therein against Samsung's competitors, including Kingston.

278. Samsung and Polaris' unlawful agreement harms competition in the DRAM Chip market because, by raising Kingston's costs, Polaris and Samsung weaken and may eliminate a valuable customer of Hynix and Micron, from whom Kingston buys DRAM Chips. The conspiracy by Samsung and Polaris has the effect of also raising costs for Hynix and Micron, thus weakening competition, further

`

enhancing Samsung's monopoly and ability to raise prices, and unreasonably restraining trade.

279. Samsung and Polaris' unlawful agreement harms competition in the DRAM Module market because Kingston will be forced to pay an increased cost to acquire the component DRAM Module parts, pay a discriminatory and anticompetitive fee to license the component parts allegedly covered by the patent portfolio, and is subjected to discriminatory and baseless infringement litigation filed by Polaris in combination with Samsung. Taken together, all of this conduct has the effect of increasing Kingston's costs of manufacturing and distributing DRAM modules, weakening Kingston's ability to constrain Samsung's monopoly power and ability to raise prices.

280. The conspiratorial conduct alleged herein has harmed and continues to harm competition for DRAM Chips and DRAM Modules, which are products in the flow of interstate commerce.

281. As a result of the conduct alleged herein, Kingston itself, its customers and the consuming public are and will continued to be harmed in the form of increased prices and decreased competition in the DRAM Chip and DRAM Module markets.

282. Any legitimate business reason or justification for the agreement between Samsung and Polaris to acquire the patent portfolio and selectively target Kingston is outweighed by the significant harm caused to Kingston, its suppliers and customers, other DRAM Module manufacturers and the consuming public in the form of decreased competition.

283. Samsung's agreement with Polaris is an unreasonable restraint of trade that violates California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

`

**TWENTY-FIRST CLAIM FOR RELIEF**

**(Unlawful and/or Unfair Business Practice or Act)**

**(Unfair Competition Law, Cal. Bus. & Prof. Code § 17200)**

**(Against Counterclaim-Defendant Polaris and Third-Party Defendants Samsung Electronics and Samsung Semiconductor)**

284. Kingston incorporates by reference the allegations contained in paragraphs 1 through 283 above, as though set forth in full.

285. By the acts and conduct alleged, Polaris and Samsung have engaged in unfair competition within the meaning of the California Business & Professions Code § 17200, *et seq*. and the common law.

286. Kingston is informed and believes, and on that basis alleges, that Polaris and Samsung have engaged in unfair business practices including, but not limited to refusing to sell, without any legitimate purpose, DRAM Chips to Kingston; conspiring to acquire the Qimonda Portfolio and to assert select patents against Kingston discriminatorily and in an attempt to weaken and harm Kingston's DRAM Module business; conspiring to target Kingston as the subject for baseless and discriminatory litigation; conspiring to try to extract from Kingston anticompetitive, unnecessary and discriminatory royalties from Kingston; conspiring to unlawfully enhance and maintain Samsung's monopoly power in the DRAM Chips and DRAM Module markets and to use such monopoly power to weaken and/or harm Kingston and others in those markets, including OEMs and consumers.

287. The acts of Polaris and Samsung violate and/or threaten to violate the policy or spirit of the antitrust laws, and otherwise significantly threaten and/or harm competition. By the deceptive acts, practices, and conduct alleged above, Polaris and Samsung are violating Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and 16700 *et seq*. of the Cartwright Act, Cal. Bus. & Prof. Code Section, which has injured competition, as well as consumers in California and elsewhere.

288. By reason of Polaris' and Samsung's acts, Kingston also has suffered, and will continue to suffer, irreparable harm, for which Kingston has no adequate remedy at law. Unless and until Polaris' and Samsung's conduct is enjoined, Polaris and Samsung will continue to engage in the acts alleged herein.

289. Kingston is entitled to relief, including an injunction and/or restitution.

## PRAYER FOR RELIEF

WHEREFORE, Kingston denies that Polaris is entitled to any relief, including the relief requested in its Prayer for Relief, Kingston respectfully requests that the Court enter a judgment against Polaris and in favor of Kingston as follows:

A. That Polaris takes nothing and be denied any relief whatsoever;

B. That the Complaint be dismissed on the merits and with prejudice;

C. That the claims of the Asserted Patents be declared to be not infringed by Kingston;

D. That the claims of the Asserted Patents be declared to be invalid and/or unenforceable;

E. Awarding Kingston damages sufficient to compensate it for the injuries it has sustained on account of Polaris' breach of contract;

F. Compelling Polaris to offer licenses to the Asserted Patents on RAND terms;

G. That Kingston be awarded its costs incurred in connection with this action;

H. That this case be deemed exceptional pursuant to 35 U.S.C. § 285 and that Kingston be awarded reasonable attorneys' fees;

I. That the contract, combination or conspiracy, and the acts done in furtherance thereof by Polaris and Samsung as alleged in this Complaint, be adjudicated and decreed a violation of Sections 1 and 2 of the Sherman Act;

`

J. That Polaris' and Samsung's unlawful attempt to monopolize the markets for DRAM Chips and DRAM Modules for computers, unlawful acquisition and maintenance of a monopoly in the markets for DRAM Chips and DRAM Modules for computers, and other discriminatory, exclusionary and anticompetitive conduct and actions as alleged in this Complaint be adjudicated and decreed to violate Section 2 of the Sherman Act, Section 7 of the Clayton Act, Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

K. That Kingston recover damages sustained by it, as provided by the federal antitrust laws, in an amount to be trebled in accordance with the federal antitrust laws pursuant to 15 U.S.C. §15(a);

L. That Polaris and Samsung, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy and agreement alleged herein and from continuing to unlawfully maintain or attempt to obtain a monopoly in the markets for DRAM Chips and DRAM Modules for computers;

M. That Kingston be awarded pre-judgment and post-judgment interest in accordance with the law; and

N. That Kingston be awarded such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Kingston demands a trial by jury as to all claims, counterclaims, third-party claims and issues properly triable thereby.

`

Dated: November 21, 2016

Vinson & Elkins L.L.P.

By: */s/ Christopher Kao*

Christopher Kao

Attorneys for Defendant
Kingston Technology Company, Inc.

`

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 21, 2016, the foregoing document was electronically filed with the Clerk of the Court for the UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, using Court's Electronic Case Filing (ECF) system. The ECF system routinely sends a "Notice of Electronic Filing" to all attorneys of record who have consented to accept this notice as service of this document by electronic means. Further, the undersigned certifies that a copy of the foregoing document was served upon opposing counsel of record by e-mail, according to an agreement among the parties that e-mail service is sufficient.

Dated: November 21, 2016

By: *<u>/s/ Christopher Kao</u>*
Christopher Kao

US 4780636